(Slip Opinion) OCTOBER TERM, 2020 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TERRY *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 20–5904. Argued May 4, 2021—Decided June 14, 2021

Petitioner Tarahrick Terry contends that he is eligible to receive a sentence reduction for his 2008 crack cocaine conviction. In 1986, Congress established mandatory-minimum penalties for certain drug offenses. That legislation defined three relevant penalties for possession with intent to distribute cocaine. The first two carried mandatory minimum sentences based on drug quantity: a 5-year mandatory minimum (triggered by either 5 grams of crack cocaine or 500 grams of powder cocaine) and a 10-year mandatory minimum (triggered by either 50 grams of crack or 5 kilograms of powder). 100 Stat. 3207–2, 3207–3. The third penalty differed from the first two: it did not carry a mandatory minimum sentence, did not treat crack and powder cocaine offenses differently, and did not depend on drug quantity. *Id.*, at 3207–4. Petitioner was subjected to this third penalty when he pleaded guilty in 2008 to possession with intent to distribute an unspecified amount of crack. The District Court determined that his offense involved about 4 grams of crack.

Two years later, Congress passed the Fair Sentencing Act of 2010, which increased the crack quantity thresholds from 5 grams to 28 for the 5-year mandatory minimum and from 50 grams to 280 for the 10-year mandatory minimum. §2(a), 124 Stat. 2372. But Congress did not make this change retroactive until 2018, when it enacted the First Step Act. After that, Petitioner sought resentencing on the ground that he was convicted of a crack offense modified by the Fair Sentencing Act. The District Court denied his motion, and the Eleventh Circuit affirmed.

*Held*: A crack offender is eligible for a sentence reduction under the First Step Act only if convicted of a crack offense that triggered a mandatory minimum sentence. The First Step Act makes an offender eligible for

a sentence reduction only if the offender previously received "a sentence for a covered offense." §404(b), 132 Stat. 5222. The Act defines "'covered offense'" as "a violation of a Federal criminal statute, the statutory penalties for which were modified by" certain provisions in the Fair Sentencing Act. §404(a), *ibid.* The Fair Sentencing Act modified the statutory penalties for offenses that triggered mandatory minimum penalties because a person charged with the same conduct today no longer would face the same statutory penalties that they would have faced before 2010. For example, a person charged with knowing or intentional possession with intent to distribute at least 50 grams of crack was subject to a 10-year mandatory minimum before 2010. Now, he would be subject only to a 5-year mandatory minimum. But the Fair Sentencing Act did not modify the statutory penalties for petitioner's offense. Before 2010, a person charged with petitioner's offense—knowing or intentional possession with intent to distribute an unspecified amount of a schedule I or II drug—was subject to statutory penalties of imprisonment of 0-to-20 years and up to a $1 million fine, or both, and a period of supervised release. After 2010, a person charged with this conduct is subject to the exact same statutory penalties. Petitioner thus is not eligible for a sentence reduction. Pp. 5–8.

828 Fed. Appx. 563, affirmed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and BREYER, ALITO, KAGAN, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. SOTOMAYOR, J., filed an opinion concurring in part and concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order that
corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 20– 5904

TARAHRICK TERRY, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[June 14, 2021]

JUSTICE THOMAS delivered the opinion of the Court.

In 1986, Congress established mandatory-minimum pen-
alties for cocaine offenses. If the quantity of cocaine in-
volved in an offense exceeded a minimum threshold, then
courts were required to impose a heightened sentence. Con-
gress set the quantity thresholds far lower for crack of-
fenses than for powder offenses. But it has since narrowed
the gap by increasing the thresholds for crack offenses more
than fivefold. The First Step Act of 2018, Pub. L. 115–391,
132 Stat. 5194, makes those changes retroactive and gives
certain crack offenders an opportunity to receive a reduced
sentence. The question here is whether crack offenders who
did *not* trigger a mandatory minimum qualify. They do not.

I

In the mid-1980s, the United States witnessed a steep
surge in the use of crack cocaine, and news of high-profile,
cocaine-related deaths permeated the media. Witnesses be-
fore Congress, and Members of Congress themselves, be-
lieved that a "crack epidemic" was also fueling a crime
wave. Crack, they said, was far more addictive and danger-
ous than powder cocaine; it was cheaper and thus easier to

obtain; and these and other factors spurred violent crime.[1]

In response to these concerns, Congress quickly passed a bill with near unanimity.[2] The new law created mandatory-minimum penalties for various drug offenses, and it set much lower trigger thresholds for crack offenses. The Act included two base penalties that depended on drug quantity: a 5-year mandatory minimum (triggered by 5 grams of crack or 500 grams of powder) and a 10-year mandatory minimum (triggered by 50 grams of crack or 5 kilograms of powder). 100 Stat. 3207–2, 3207–3. The Act also created a third penalty—possession with intent to distribute an unspecified amount of a schedule I or II drug—that did not treat crack and powder offenses differently, did not depend on drug quantity, and did not include a mandatory minimum. *Id.,* at 3207–4.

Petitioner was convicted under this Act and subjected to

––––––––––

[1] United States Sentencing Commission, Report to the Congress: Cocaine and Federal Sentencing Policy 5–6, 9–10, and n. 31 (May 2002); "Crack" Cocaine, Hearing before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, 99th Cong., 2d Sess., 2, 5–6, 10, 94 (1986).

[2] The Act passed the Democratic-controlled House, where it was introduced, 392 to 16. H. R. 5484, 99th Cong., 2d Sess. (1986); 132 Cong. Rec. 23003–23004 (1986). It passed the Republican-controlled Senate 97 to 2. *Id.,* at 27251–27252. A majority of the Congressional Black Caucus cosponsored and voted for the bill. Compare *id.,* at 23003, with Hearing before the Congressional Black Caucus, "Brain Trust on Aging" and the House Select Committee on Aging, 99th Cong., 1st Sess., iii (1985). Many black leaders in that era professed two concerns. First, crack was fueling crime against residents in inner cities, who were predominantly black. For example, the president of an NAACP chapter in the D. C. region called crack "'the worst thing to hit us since slavery,'" a sentiment echoed by the leading black newspaper in Los Angeles. J. Forman, Jr., Locking Up Our Own 158 (2017). Second, there were concerns that prosecutors were not taking these kinds of crimes seriously enough because the victims were disproportionately black. In the words of John Ray, a D. C. councilmember who spearheaded a successful effort to create mandatory minimum penalties: "'Black crimes against blacks get very low sentences,'" unlike crimes against whites. *Id.,* at 132.

the third penalty. In exchange for the Government dropping two firearm charges, petitioner pleaded guilty in 2008 to possession with intent to distribute an unspecified amount of crack. At sentencing, the District Court determined that his offense involved about 4 grams of crack, a schedule II drug. See 21 U. S. C. §812; 21 CFR §1308.12 (2006). It also determined that petitioner was a career offender under the Sentencing Guidelines. United States Sentencing Commission, Guidelines Manual §4B1.1(b) (Nov. 2008) (USSG). The career-offender Guidelines controlled because they recommended a higher sentence than the drug-quantity Guidelines. *Ibid.* The District Court sentenced petitioner to 188 months, the bottom of the career-offender Guidelines range.

All this occurred while Congress was considering whether to change the quantity thresholds for crack penalties. In 1995, the Sentencing Commission issued a report to Congress stating that it thought the 100-to-1 ratio was too high. In particular, it stressed that the then-mandatory Guidelines helped make the ratio excessive because the Guidelines, which were not yet in effect when Congress created the ratio, addressed some of Congress' concerns about crack. Addressing those concerns through both the ratio *and* the Guidelines, the Commission said, "doubly punished" offenders. United States Sentencing Commission, Special Report to the Congress: Cocaine and Federal Sentencing Policy 195–197 (Feb. 1995). Separately, although the Commission thought that it was reasonable to conclude that "crack cocaine poses greater harms to society than does powder cocaine," it determined that the ratio overstated the difference in harm. *Ibid.* Finally, the Commission noted that persons convicted of crack offenses were disproportionately black, so a ratio that was too high created a "perception of unfairness" even though there was no reason to believe "that racial bias or animus undergirded the initiation

of this federal sentencing law." *Id.,* at 153–154, 192. Members of Congress responded to this and similar reports. For example, Senators Sessions and Hatch introduced legislation in 2001 to lower the ratio to 20 to 1. S. 1874, 107th Cong., 1st Sess. Representative Jackson-Lee led a similar effort in the House, but would have created a 1-to-1 ratio. H. R. 4545, 110th Cong., 1st Sess. (2007).

Two years after petitioner was sentenced, these attempts to change the ratio came to fruition. In the Fair Sentencing Act of 2010, 124 Stat. 2372, note following 21 U. S. C. 801, Congress reaffirmed its view that the triggering thresholds should be lower for crack offenses, but it reduced the 100-to-1 ratio to about 18 to 1. It did so by increasing the crack quantity thresholds from 5 grams to 28 for the 5-year mandatory minimum and from 50 grams to 280 for the 10-year mandatory minimum. §2(a), 124 Stat. 2372. These changes did not apply to those who had been sentenced before 2010.

The Sentencing Commission then altered the drug quantity table used to calculate Guidelines ranges. USSG §2D1.1(c). The Commission decreased the recommended sentence for crack offenders to track the statutory change Congress made. It then made the change retroactive, giving previous offenders an opportunity for resentencing. Courts were still constrained, however, by the statutory minimums in place before 2010. Many offenders thus remained sentenced to terms above what the Guidelines recommended. Congress addressed this issue in 2018 by enacting the First Step Act. This law made the 2010 statutory changes retroactive and gave courts authority to reduce the sentences of certain crack offenders.

Petitioner initially sought resentencing under the new, retroactive Guidelines. But because his sentence was based on his recidivism, not his drug quantity, his attempt was unsuccessful. After Congress enacted the First Step Act, petitioner again sought resentencing, this time contending that he falls within the category of crack offenders covered

by that Act. The District Court denied his motion, and the Eleventh Circuit affirmed, holding that offenders are eligible for a sentence reduction only if they were convicted of a crack offense that triggered a mandatory minimum. 828 Fed. Appx. 563 (2020) (*per curiam*). We granted certiorari. 592 U. S. \_\_\_ (2021).

On the day the Government's brief was due, the United States informed the Court that, after the change in administration, it would no longer defend the judgment. Because of the timeline, the Court rescheduled argument, compressed the briefing schedule, and appointed Adam K. Mortara as *amicus curiae* to argue in support of the judgment. He has ably discharged his responsibilities.

## II

An offender is eligible for a sentence reduction under the First Step Act only if he previously received "a sentence for a covered offense." §404(b), 132 Stat. 5222. The Act defines "'covered offense'" as "a violation of a Federal criminal statute, the statutory penalties for which were modified by" certain provisions in the Fair Sentencing Act. §404(a), *ibid.* Here, "statutory penalties" references the entire, integrated phrase "a violation of a Federal criminal statute." *United States* v. *Jones*, 962 F. 3d 1290, 1298 (CA11 2020). And that phrase means "offense." Black's Law Dictionary 1300 (11th ed. 2019) ("A violation of the law"). We thus ask whether the Fair Sentencing Act modified the statutory penalties for petitioner's offense. It did not.

The elements of petitioner's offense are presented by two subsections of 21 U. S. C. §841. Subsection (a) makes it unlawful to knowingly or intentionally possess with intent to distribute any controlled substance. Subsection (b) lists additional facts that, if proved, trigger penalties.

Before 2010, §§841(a) and (b) together defined three crack offenses relevant here. The elements of the first offense were (1) knowing or intentional possession with intent to

distribute, (2) crack, of (3) at least 50 grams. §§841(a), (b)(1)(A)(iii). This subparagraph (A) offense was punishable by 10 years to life, in addition to financial penalties and supervised release. The elements of the second offense were (1) knowing or intentional possession with intent to distribute, (2) crack, of (3) at least 5 grams. §§841(a), (b)(1)(B)(iii). This subparagraph (B) offense was punishable by 5-to-40 years, in addition to financial penalties and supervised release. And the elements of the third offense were (1) knowing or intentional possession with intent to distribute, (2) some unspecified amount of a schedule I or II drug. §§841(a), (b)(1)(C).

Petitioner was convicted of the third offense—subparagraph (C). Before 2010, the statutory penalties for that offense were 0-to-20 years, up to a $1 million fine, or both, and a period of supervised release.[3] After 2010, these statutory penalties remain exactly the same. The Fair Sentencing Act thus did not modify the statutory penalties for petitioner's offense.

Petitioner's offense is starkly different from the offenses that triggered mandatory minimums. The Fair Sentencing Act plainly "modified" the "statutory penalties" for those. It did so by increasing the triggering quantities from 50 grams to 280 in subparagraph (A) and from 5 grams to 28 in subparagraph (B). Before 2010, a person charged with the original elements of subparagraph (A)—knowing or intentional possession with intent to distribute at least 50 grams of crack—faced a prison range of between 10 years and life.

―――――――――

[3] All three subparagraphs carried, and continue to carry, heightened penalties if an offense caused death or serious bodily injury or if the defendant was a repeat offender. Petitioner's actual sentencing range under subparagraph (C) was 0-to-30 years because he had a prior felony drug offense. 828 Fed. Appx. 563, 565 (CA11 2020). Because these enhancements are identical before and after 2010, they make no difference to the analysis. Petitioner's enhancement for his prior conviction is thus omitted from the body of the opinion for the sake of simplicity.

But because the Act increased the trigger quantity under subparagraph (A) to 280 grams, a person charged with those original elements after 2010 is now subject to the more lenient prison range for subparagraph (B): 5-to-40 years. Similarly, the elements of an offense under subparagraph (B) before 2010 were knowing or intentional possession with intent to distribute at least 5 grams of crack. Originally punishable by 5-to-40 years, the offense defined by those elements[4] is now punishable by 0-to-20 years— that is, the penalties under subparagraph (C). The statutory penalties thus changed for all subparagraph (A) and (B) offenders. But no statutory penalty changed for subparagraph (C) offenders. That is hardly surprising because the Fair Sentencing Act addressed "cocaine sentencing disparity," §2, 124 Stat. 2372, and subparagraph (C) had never differentiated between crack and powder offenses.

To avoid this straightforward result, petitioner and the United States offer a sleight of hand. Petitioner says that the phrase "statutory penalties" in fact means "penalty statute." The United States similarly asserts that petitioner is eligible for a sentence reduction if the Fair Sentencing Act changed the "penalty scheme."

But we will not convert nouns to adjectives and vice versa. As stated above, "statutory penalties" references the entire phrase "*a violation* of a Federal criminal statute." It thus directs our focus to the statutory penalties for petitioner's *offense*, not the statute or statutory scheme.

Even if the "penalty statute" or "penalty scheme" were the proper focus, neither was modified for subparagraph (C) offenders. To "modify" means "to change moderately." *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 512 U. S. 218, 225 (1994). The Fair Sentencing

_____

[4] Of course, an indictment that charged a person with 5 grams of crack now is no different from one charging the person with an unspecified amount of crack. The usual practice is to ignore extraneous language in an indictment. *E.g., Ford* v. *United States*, 273 U. S. 593, 602 (1927).

Act changed nothing in subparagraph (C). The United States notes that prosecutors before 2010 could charge offenders under subparagraph (B) if the offense involved between 5 and 28 grams of crack; now, prosecutors can charge those offenders only under subparagraph (C). But even before 2010, prosecutors could charge those offenders under subparagraph (C) because quantity has never been an element under that subparagraph. See, *e.g.*, *United States* v. *Birt*, 966 F. 3d 257, 259 (CA3 2020) (noting that an offender charged under subparagraph (C) had possessed 186 grams of crack). It also defies common parlance to say that altering a *different* provision modified subparagraph (C). If Congress abolished the crime of possession with intent to distribute, prosecutors then would have to bring charges under the lesser included offense of simple possession. But nobody would say that abolishing the first offense changed the second.

In light of the clear text, we hold that §2(a) of the Fair Sentencing Act modified the statutory penalties only for subparagraph (A) and (B) crack offenses—that is, the offenses that triggered mandatory-minimum penalties. The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 20– 5904

_____

TARAHRICK TERRY, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[June 14, 2021]

JUSTICE SOTOMAYOR, concurring in part and concurring in the judgment.

I agree with the Court's interpretation of the First Step Act, join Part II of its opinion, and concur in the judgment.[1]

_____

[1] I do not join Part I of the Court's opinion because it includes an unnecessary, incomplete, and sanitized history of the 100-to-1 ratio. The full history is far less benign. The Court, *ante,* at 2, n. 2, emphasizes Black leaders' support for "tough-on-crime" policies, but ignores that these leaders "also called for federal investment in longer-term, root-cause solutions such as welfare, education, and job training programs." J. Forman, Locking Up Our Own 157 (2017) (Forman). But "[t]he help never arrived," leaving Black communities with "just the tough-on-crime laws" and little else. *Id.,* at 12. Nor does the Court mention that the "'careful deliberative practices of the Congress were set aside'" for the 1986 omnibus crime bill that included the 100-to-1 ratio, as part of a "rush to pass dramatic drug legislation before the midterm elections." Sklansky, Cocaine, Race, and Equal Protection, 47 Stan. L. Rev. 1283, 1294, and n. 55 (1996) (Sklansky). Indeed, the "legislative history offers no explanation for the selection of a ratio of 100:1," save that it "was the highest ratio proposed." *Id.,* at 1297. There is, by contrast, an extensive record of race-based myths about crack cocaine that the media "branded onto the public mind and the minds of legislators," *United States* v. *Clary*, 846 F. Supp. 768, 783 (ED Mo. 1994), and that appear in the Congressional Record, see Sklansky 1291–1295, and nn. 49–60. Most egregiously, the Court barely references the ratio's real-world impact (discussed *infra*, at 3–4), and disregards the fact that, "as the racial effects of mandatory minimums and the crack/cocaine disparity became apparent, the [Congressional Black Caucus] came together in unanimous and increasingly vocal opposition to the law." Forman 205. Bills to mitigate

I write separately to clarify the consequences of today's decision. While the Fair Sentencing Act of 2010 and First Step Act of 2018 brought us a long way toward eradicating the vestiges of the 100-to-1 crack-to-powder disparity, some people have been left behind.

Among them are people like petitioner Tarahrick Terry, who was convicted under 21 U. S. C. §841(b)(1)(C) for possessing with intent to distribute a small amount of crack cocaine and was sentenced as a career offender. If Terry had been convicted under §841(b)(1)(A) or §841(b)(1)(B), which require larger quantities of drugs, he would be eligible for resentencing under the First Step Act (even if sentenced as a career offender). Similarly, despite being convicted under subparagraph (C), if Terry's Sentencing Guidelines range had been calculated like that of a non-career offender, he would have been eligible for a sentence reduction when the United States Sentencing Commission retroactively reduced the amount of crack cocaine necessary to trigger higher Guidelines ranges. But because Terry was both convicted under subparagraph (C) and sentenced as a career offender, he has never had a chance to ask for a sentence that reflects today's understanding of the lesser severity of his crime. Absent action from the political branches, he never will.

I

Section 841(b) provides three tiers of statutory "[p]enalties" for federal drug offenses under §841(a). As a baseline, §841(b)(1)(C) specifies a maximum penalty of 20 years imprisonment, with no mandatory minimum. Sections 841(b)(1)(A) and (B) then authorize enhanced penalty ranges, including mandatory minimums, for those dealing in higher quantities of narcotics.

_____

the disparity were introduced almost every year from 1993 to 2009. Yet Congress did nothing until 2010.

As enacted in 1986, §841(b) created a 100-to-1 ratio between the amounts of powder and crack cocaine necessary to trigger the mandatory minimums in §§841(b)(1)(A) and (B). Subparagraph (A)'s 10-year minimum was triggered by 5,000 grams of powder cocaine (about the weight of a gallon of paint), but only 50 grams of crack cocaine (about half a stick of butter). Subparagraph (B)'s 5-year minimum required 500 grams of powder (heavier than a football) but just five grams of crack (the weight of a nickel).

The United States Sentencing Commission (USSC) incorporated the 100-to-1 ratio into the Sentencing Guidelines. The Guidelines include a "Drug Quantity Table," which sets "base offense level[s]" that correspond to various ranges of weights for each drug type. USSC, Guidelines Manual §2D1.1 (Nov. 2018) (USSG). A defendant's base offense level, together with his criminal history, determines the "Guidelines range" of sentences. The more drugs possessed, the higher the base offense level, and the higher the Guidelines range. Because the drug quantity tables are keyed to the statutory minimums, selling a given weight of crack cocaine would lead to the same base offense level as selling 100 times as much powder cocaine. Street-level crack dealers could thus receive significantly longer sentences than wholesale importers of powder cocaine.

Under the 1986 law, crack cocaine sentences were about 50 percent longer than those for powder cocaine. USSC, Report to the Congress: Cocaine and Federal Sentencing Policy 13 (May 2007) (2007 Report). Black people bore the brunt of this disparity. Around 80 to 90 percent of those convicted of crack offenses between 1992 and 2006 were Black, while Black people made up only around 30 percent of powder cocaine offenders in those same years. *Id.,* at 16.

There was no meaningful policy justification for such unequal sentences. The 100-to-1 ratio "rested on assumptions about the relative harmfulness of the two drugs and the relative prevalence of certain harmful conduct associated with

their use and distribution that . . . research and data no longer support." *Kimbrough* v. *United States*, 552 U. S. 85, 97 (2007) (internal quotation marks omitted). This was obvious to the public, which came "to understand sentences embodying the 100-to-1 ratio as reflecting unjustified race-based differences." *Dorsey* v. *United States*, 567 U. S. 260, 268 (2012).

The Sentencing Commission published detailed reports in 1995, 1997, 2002, and 2007 asking Congress to reduce the disparity, which it found to be unjustified standing alone, and particularly unjustified in light of its disparate impact. See *Kimbrough*, 552 U. S*.,* at 97–100. Each report "unanimously and strongly urge[d] Congress to act promptly" to "[i]ncrease the five-year and ten-year statutory mandatory minimum threshold quantities for crack cocaine offenses." 2007 Report 8.

## II

Congress eventually responded with the Fair Sentencing Act of 2010. 124 Stat. 2372. Section 2 of the Act increased the amounts of crack cocaine necessary to trigger minimum sentences, reducing the crack-to-powder ratio to 18 to 1. §2(a), *ibid.* The Sentencing Commission, in turn, quickly revised the drug quantity tables to reflect that new ratio. USSG App. C, Amdt. 748 (Nov. 2010). It later made those amendments retroactive, thus making reduced sentences available to thousands of crack offenders who were serving prison sentences based on unduly high Guidelines ranges. USSG App. C, Amdt. 759 (Nov. 2011).

These amendments, however, had two principal shortcomings. First, the Fair Sentencing Act's changes to the mandatory minimums were not retroactive. Even if an offender's new Guidelines range was below the applicable minimum, the court could go no lower. Second, not all offenders could move for reduced sentences. Such motions are available only to individuals whose original sentences

were "based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U. S. C. §3582(c)(2). Offenders whose Guidelines ranges were not based on the drug quantity tables were ineligible, even if the 100-to-1 ratio clearly affected their actual sentence.

Take so-called "career offenders" like Terry. A defendant is a career offender if he commits a felony "controlled substance offense" or "crime of violence" when he is over 18 and when he already has two prior such felony convictions. USSG §4B1.1(a). The offense level for career offenders is based on the statutory maximum for their crime of conviction, not the drug quantity tables. USSG §4B1.1(b).

Terry possessed just 3.9 grams of crack. His Guidelines range would normally have been about three to four years. But Terry was sentenced as a career offender because of two prior drug convictions committed when he was a teenager and for which he spent a total of only 120 days in jail. That enhancement caused Terry's Guidelines range to skyrocket to about 15 to 20 years. He received a sentence of 188 months (at the bottom of the Guidelines range). Because the Fair Sentencing Act and the following Guidelines amendments did not change their Guidelines ranges, career offenders like Terry were categorically ineligible for relief, regardless of the severity or circumstances of their crimes.

Career offenders were not, however, free from the harsh effects of the 100-to-1 ratio. Prior to applying the career offender enhancement, district courts still calculated the offender's base offense level using the drug quantity tables. That preenhancement base offense level is a significant indicator of an offense's gravity, and thus of the sentence it merits. A career offender with a higher base offense level closer to the statutory minimum would likely receive a harsher punishment than one with a lower base offense level further from the minimum.

In some cases, the 100-to-1 ratio played an even more di-

rect role. Especially for less serious offenders, courts sometimes entirely departed from the career offender Guidelines and instead sentenced defendants based on the more lenient drug quantity tables.[2] But offenders were only eligible for sentence reductions if retroactive amendments changed their Guidelines range as "determined before consideration of any departure . . . or any variance." USSG §1B1.10, comment., n. 1(A). Hence, even career offenders whose sentences were based expressly on the 100-to-1 ratio in the drug quantity tables could not obtain reduced sentences when that ratio was retroactively lowered.

The law's assessment of these offenders' culpability radically changed with the Fair Sentencing Act. For example, Terry's 3.9 grams of crack cocaine (less than the weight of four paperclips) led to a preenhancement base offense level of 20 and was just shy of the five grams that triggered a 5-year mandatory minimum. He would have received the same base offense level for selling 390 grams of powder cocaine (about the weight of a full can of soda). After the Guidelines amendments, those 3.9 grams are nowhere near the 28 grams that now trigger the mandatory minimum, and his preenhancement base offense level would be just 16, the same as for selling 70 grams of powder cocaine (about the weight of two lightbulbs). His preenhancement Guidelines range dropped from 41 to 51 months to 27 to 33 months. In short, the law now treats Terry's offense as a far less serious crime.

The career offender Guidelines, like all the Guidelines, are merely advisory. See *United States* v. *Booker*, 543 U. S. 220, 246 (2005). Terry possessed a very small amount of crack cocaine, and he was a teenager when he committed the two prior drug offenses that made him a career offender.

─────────

[2] This practice was common enough to give rise to a split among the Courts of Appeals over whether such offenders were eligible for sentence reductions. See, *e.g., United States* v. *Munn*, 595 F. 3d 183, 194–195 (CA4 2010); *United States* v. *Sharkey*, 543 F. 3d 1236, 1239 (CA10 2008).

Free of the arbitrary influence of the 100-to-1 ratio, he would be a much stronger candidate for a downward departure.

## III

The First Step Act of 2018 partially filled the gaps left by the Fair Sentencing Act. As the Court explains, everyone with a pre-August 3, 2010, crack conviction under §841(b)(1)(A) or §841(b)(1)(B), including career offenders, has a "covered offense" and is eligible for resentencing. This corrects the Fair Sentencing Act's first shortcoming, as individuals who would not be subject to the same minimums today can now seek resentencing without those floors.

But, as the Court also explains, no one convicted under §841(b)(1)(C) has a covered offense. The First Step Act therefore only partly addresses the Fair Sentencing Act's second shortcoming. While career offenders convicted under subparagraph (A) or subparagraph (B) can now seek resentencing, that door remains closed to career offenders convicted under subparagraph (C).

This is no small injustice. Career offenders made up more than half of the 2,387 defendants who obtained retroactive sentence reductions in just the first year of the First Step Act's implementation. USSC, The First Step Act of 2018: One Year of Implementation 44 (Aug. 2020). In part because there were so many career offenders who were previously ineligible, the average sentence reduction under the First Step Act was almost six years. *Id.,* at 43.

Between 2005 and 2010, around 15 percent of offenders who possessed less than five grams of crack were sentenced as career offenders. USSC, Report to Congress: Impact of the Fair Sentencing Act of 2010, p. A–32 (Aug. 2015). In courts that permitted their motions before today's decision, many such offenders obtained dramatically lower sentences after the First Step Act. See App. to Reply Brief 1a–2a (collecting cases). "Decisions like these, from courts that have

actually had to apply the statute, demonstrate that the Fair Sentencing Act amendments have a meaningful effect on the sentences that defendants receive under §841(b)— including for defendants sentenced under subsection (b)(1)(C)" as career offenders. Brief for Retired Federal Judges et al. as *Amici Curiae* 15.

There is no apparent reason that career offenders sentenced under subparagraph (C) should be left to serve out sentences that were unduly influenced by the 100-to-1 ratio. Indeed, the bipartisan lead sponsors of the First Step Act have urged this Court to hold that the Act "makes retroactive relief broadly available to all individuals sentenced for crack-cocaine offenses before the Fair Sentencing Act." Brief for Sen. Richard Durbin et al. as *Amici Curiae* 11. Unfortunately, the text will not bear that reading. Fortunately, Congress has numerous tools to right this injustice.