18-2811(L)
USA v. Blaszczak

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2020

(Argued: June 9, 2021                                        Decided: December 27, 2022)

Docket Nos. 18-2811, 18-2825, 18-2867, 18-2878

_____

UNITED STATES OF AMERICA,

*Appellee*,

- v. -

DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN, CHRISTOPHER WORRALL,

*Defendants-Appellants*.

_____

Before: KEARSE, WALKER, and SULLIVAN, *Circuit Judges*.

Appeals, following vacatur and remand by the United States Supreme Court for further consideration, in light of *Kelly v. United States*, 140 S. Ct. 1565 (2020), of this Court's prior affirmance of judgments of the United States District Court for the Southern District of New York convicting some or all of the defendants on substantive counts of

conversion of government property in violation of 18 U.S.C. § 641, wire fraud in violation of 18 U.S.C. § 1343, and securities fraud in violation of 18 U.S.C. § 1348; and convicting certain of the defendants on various counts of conspiring to engage in conduct violating one or more of the above sections, all originating from misappropriation of confidential information from the Centers for Medicare & Medicaid Services ("CMS"), *see United States v. Blaszczak*, 947 F.3d 19 (2d Cir. 2019), *vacated and remanded*, 141 S. Ct. 1040, 2021 WL 78042, 2021 WL 78043 (Jan. 11, 2020). On this remand: (A) defendants contend that their argument that the CMS information at issue does not constitute "property" or a "thing of value" within the meaning of the above statutes is supported by the Supreme Court's decision in *Kelly*; (B) the government, concurring in that contention, confesses error as to the substantive counts and as to a count charging only conspiracy to violate §§ 1343 and 1348 (Count Two); and it agrees that either the defendants' convictions on those counts should be reversed, or the cases should be remanded to the district court so that the government can dismiss those counts pursuant to Fed. R. Crim. P. 48(a); and (C) the government seeks affirmance on the remaining conspiracy counts (Counts One and Seventeen).

Given the Supreme Court's decision in *Kelly* and the prosecutorial discretion to which the Executive Branch of the government is entitled, we grant the government's request to remand the cases to the district court for dismissal of the substantive counts and Count Two. As to Counts One and Seventeen, the verdicts do not reveal whether the jury

2

found that the charged defendants conspired to commit offenses as to which the government has confessed error or instead found that they conspired to engage in other charged criminal conduct. Accordingly, we vacate the convictions on these two counts and remand for such further proceedings as may be appropriate.

Remanded for dismissal of the substantive counts and Count Two; vacated and remanded for further proceedings on Counts One and Seventeen.

Judge Walker joins the majority opinion and concurs in a separate concurring opinion, in which Judge Kearse joins.

Judge Sullivan dissents, in a separate opinion.

ERIC J. FEIGIN, Deputy Solicitor General, United States Department of Justice, Washington, D.C. (Elizabeth B. Prelogar, Acting Solicitor General, United States Department of Justice, Washington, D.C.; Audrey Strauss, United States Attorney for the Southern District of New York, Ian McGinley, Joshua A. Naftalis, Won S. Shin, Assistant United States Attorneys, New York, New York, on the brief), *for Appellee*.

DONALD B. VERRILLI, JR., Washington, D.C. (Elaine J. Goldenberg, Jonathan S. Meltzer, Dahlia Mignouna, Jacobus P. van der Ven, Munger, Tolles & Olson, Washington, D.C., David Esseks, Eugene Ingoglia, Alexander Bussey, Allen & Overy, New York, New York, on the brief *for Defendant-Appellant Robert Olan*; Daniel M. Sullivan, James M. McGuire, Holwell Shuster & Goldberg, New York, New York, Stephen Fishbein, John A. Nathanson, Shearman & Sterling, New York, New York, on the brief *for Defendant-Appellant Christopher*

3

*Worrall*; Alexandra A.E. Shapiro, Daniel J. O'Neill, Eric S. Olney, Shapiro Arato Bach, New York, New York, Barry H. Berke, Dani R. James, Kramer Levin Naftalis & Frankel, New York, New York, on the brief *for Defendant-Appellant Theodore Huber*; Colleen P. Cassidy, Barry D. Leiwant, Federal Defenders of New York, New York, New York, on the brief *for Defendant-Appellant David Blaszczak*), *for Defendants-Appellants*.

KATHERINE R. GOLDSTEIN, New York, New York (Akin Gump Strauss Hauer & Feld, New York, New York, on the brief), *Court-appointed Amicus Curiae, in support of reinstatement of this Court's decision of affirmance*.

Peter Neiman, New York, New York (Nicholas Werle, Wilmer Cutler Pickering Hale and Dorr, New York, New York, Jessica Lutkenhaus, Wilmer Cutler Pickering Hale and Dorr, Washington, D.C.; Lindsay A. Lewis, Committee of the National Association of Criminal Defense Lawyers, New York, New York, of counsel), *submitted a brief for Amicus Curiae National Association of Criminal Defense Lawyers in support of reversal*.

Roman Martinez, Washington, D.C. (Michael Clemente, Latham & Watkins, Washington, D.C., Jason M. Ohta, Latham & Watkins, San Diego, California; Stephen R. Cook, Brown Rudnick, Irvine, California, Justin S. Weddle, Weddle Law, New York, New York, of counsel), *submitted a brief for Amicus Curiae Jeffrey Wada in support of Defendants-Appellants and reversal*.

Michael H. McGinley, Philadelphia, Pennsylvania (Michael P. Corcoran, Dechert, Philadelphia, Pennsylvania, of counsel), *submitted a brief for Amicus Curiae The Alternative Investment Management Association in support of reversal*.

KEARSE, *Circuit Judge*:

This appeal returns to us on remand from the United States Supreme Court for further consideration, in light of *Kelly v. United States*, 140 S. Ct. 1565 (2020), of this Court's prior affirmance of judgments of the United States District Court for the Southern District of New York convicting defendants David Blaszczak, Theodore Huber, Robert Olan, and Christopher Worrall of conversion of government property in violation of 18 U.S.C. § 641 and wire fraud in violation of 18 U.S.C. § 1343; and convicting Blaszczak, Huber, and Olan of securities fraud in violation of 18 U.S.C. § 1348 ("Title 18 securities fraud"), conspiracy to commit wire fraud and Title 18 securities fraud in violation of 18 U.S.C. § 1349, and conspiracies in violation of 18 U.S.C. § 371 to, *inter alia*, convert government property and defraud the United States, all originating from misappropriation of confidential information from the Centers for Medicare & Medicaid Services ("CMS"), *see United States v. Blaszczak*, 947 F.3d 19 (2d Cir. 2019) ("*Blaszczak I*"), *vacated and remanded*, 141 S. Ct. 1040, 2021 WL 78043 (Jan. 11, 2021). On this remand: (A) defendants contend that their argument that the CMS information at issue does not constitute "property" or a "thing of value" within the meaning of the above statutes is supported by the Supreme Court's decision in *Kelly*; (B) the government, concurring in that contention, confesses error as to those substantive counts and as to a conspiracy count premised only on crimes concerning

5

"property" (Count Two); and it agrees that either the defendants' convictions on those counts should be reversed, or the cases should be remanded to the district court so that the government can dismiss those counts pursuant to Fed. R. Crim. P. 48(a); and (C) the government seeks affirmance on the remaining conspiracy counts on which one or more defendants were convicted (Counts One and Seventeen).

For the reasons that follow, given the Supreme Court's decision in *Kelly* and the prosecutorial discretion to which the Executive Branch of the government is entitled, we grant the government's request to remand the cases to the district court for dismissal of the substantive counts and the conspiracy charged in Count Two. As to Counts One and Seventeen, the verdicts do not reveal whether the jury found that the charged defendants conspired to engage in alleged conduct other than that which the government no longer contends was criminal. Accordingly, we vacate the convictions on these two counts and remand for such further proceedings as may be appropriate.

## I. BACKGROUND

The history of this prosecution, summarized briefly here, is set out in *Blaszczak I*, 947 F.3d 19, familiarity with which is assumed.

CMS is an agency within the United States Department of Health and Human Services. CMS administers Medicare and Medicaid, including *inter alia*, issuing rules setting reimbursement rates for healthcare providers. The rules may impact the stock prices of companies that offer products and services covered by the rates.

Worrall was an employee at CMS; Blaszczak, a consultant for hedge funds, was a former CMS employee. Huber and Olan were partners in a hedge fund ("Deerfield"). At various times between 2009 and 2014, Worrall gave Blaszczak nonpublic information about the timing and substance of proposed CMS rule changes that would change reimbursement rates for certain types of medical care for various health conditions. Blaszczak gave that information to Huber, Olan, or another Deerfield partner, following which Deerfield engaged in profitable short sales of shares of companies that would be negatively affected by reimbursement rate reductions when they became effective. Between 2010 and 2013, Blaszczak also gave such information to another hedge fund client, following which that fund profitably maintained its short positions and purchased put-options in shares of such companies.

A. *The Prosecution and the Convictions*

With respect to the above activities, defendants were indicted and tried on substantive charges of Title 18 securities fraud in violation of § 1348, securities

fraud in violation of 15 U.S.C. § 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5 (collectively "Title 15 securities fraud"), wire fraud in violation of 18 U.S.C. § 1343, and conversion of United States property (*i.e.*, the CMS information) in violation of 18 U.S.C. § 641. All four defendants were charged with conspiracy, in violation of 18 U.S.C. § 371, to commit Title 15 securities fraud, to convert government property, and to defraud the United States (Count One), and conspiracy in violation of 18 U.S.C. § 1349 to commit wire fraud and Title 18 securities fraud (Count Two). Blaszczak was charged in Count Seventeen with conspiracy in violation of § 371 to convert government property and to defraud the United States.

The jury acquitted all of the defendants on all substantive counts of Title 15 securities fraud. On the other substantive charges, all four defendants were convicted on at least one count of § 641 property conversion and at least one count of § 1343 wire fraud: Blaszczak was convicted on a total of three counts of § 641 property conversion, two counts of § 1343 wire fraud, and two counts of Title 18 securities fraud. Huber and Olan were each convicted on one count of § 641 property conversion, one count of § 1343 wire fraud, and one count of Title 18 securities fraud. Worrall was convicted only on one count of § 641 property conversion and one count of § 1343 wire fraud. As to the conspiracy counts, Blaszczak, Huber, and Olan were convicted on Counts One and Two; Blaszczak was convicted on Count Seventeen.

On appeal, defendants challenged their convictions on the principal ground that §§ 1343 and 1348 apply to fraudulent schemes to obtain "money or property" and that § 641 applies to conversion of "money[] or [a] thing of value" of the government, and that CMS's confidential information as to its plans for announcing changes in medical service reimbursement rates was not government "property" or a "thing of value" within the meaning of those statutes. The majority in *Blaszczak I* disagreed, and the convictions were affirmed.

B. *The Supreme Court's Decision in* Kelly

Following denial of defendants' petitions for rehearing in this Court and a stay of their time to seek further review, defendants petitioned the Supreme Court for certiorari. In the meantime, the Supreme Court had decided *Kelly*.

*Kelly* involved politically motivated conduct by officials in the administration of New Jersey's then-Governor Chris Christie to cause significant traffic gridlock for several days in Fort Lee, New Jersey--terminus of the George Washington Bridge to Manhattan--by reducing the Bridge's toll plaza lanes accessed from Fort Lee from three lanes to one, in retribution for the refusal of Fort Lee's mayor to endorse Christie's bid for reelection. The plan was executed under the guise of a traffic study; its exposure as a sham led to the officials' criminal prosecution.

The officials were charged with wire fraud in violation of 18 U.S.C. § 1343 (which prohibits schemes "for obtaining money or property"), fraud on a federally funded entity (*i.e.*, the Port Authority, which administered the Bridge) in violation of 18 U.S.C. § 666(a)(1)(A) (which prohibits fraudulently "obtain[ing] . . . property" from such an entity), and conspiracy to commit those crimes. After the defendants were convicted and their convictions were affirmed on appeal, the Supreme Court reversed.

The Court held that the defendants' conduct did not fall within the scope of § 1343 or § 666(a)(1)(A) because their scheme did not aim to deprive the Port Authority of money or property. The Court noted that the federal fraud statutes are "limited in scope to the protection of property rights," *Kelly*, 140 S. Ct. at 1571 (internal quotation marks omitted), and do not "criminaliz[e] all acts of dishonesty," *id*. Thus, the government was required to prove, *inter alia*, that the object of the defendants' fraud was money or property, *see id*. at 1571-72. Instead, the Court concluded, the *Kelly* defendants, by deciding the distribution of lanes for drivers on the toll road, had exercised the government's regulatory rights of "'allocation, exclusion, and control.'" *Id*. at 1573 (quoting *Cleveland v. United States*, 531 U.S. 12, 23 (2000)). The Court stated that such regulatory rights "do 'not create a property interest,'" *Kelly*, 140 S. Ct. at 1573

(quoting *Cleveland*, 531 U.S. at 23), and thus, "a scheme to alter such a regulatory choice is not one to appropriate the government's property," *Kelly*, 140 S. Ct. at 1572.

The Court rejected the government's arguments that the property aspect of § 1343 and § 666(a)(1)(A) was satisfied either because the physical lanes that the defendants "'commandeer[ed]'" were government property, *id.*, or because their project required expenditures of time and labor by Port Authority employees. The Court held that for conduct to be within those statutes, property must be more than an incidental aspect of the fraud; it "must be an 'object of the fraud.'" *Id*. at 1573 (quoting *Pasquantino v. United States*, 544 U.S. 349, 355 (2005)). As the object of the defendants' scheme was clearly to alter "a regulatory decision about the toll plaza's use" for political retaliation, rather than to take the lanes from the government or to convert them to non-public use, the lanes as property played no more than a "bit part in [the] scheme." *Kelly*, 140 S. Ct. at 1573. Similarly, in contrast to a misuse of public employees to renovate an official's home, the defendants merely altered a regulation; "[e]very regulatory decision" involves some employee labor, and that expended by the Port Authority employees was "only an incidental byproduct of the scheme." *Id*. at 1573-74.

11

C. *The Parties' Positions on Remand in Light of* Kelly

In the present case, defendants successfully petitioned for certiorari, with some support from the government: "At the request of the Acting Solicitor General, the Supreme Court granted the petitions" of defendants for certiorari, "vacated this Court's judgment, and remanded the case for further consideration in light of *Kelly*." (Government brief on remand at 2.)

Defendants on this remand renew their principal contention that the CMS information at issue does not constitute "property" or a "thing of value" within the meaning of the fraud and conversion statutes, and they contend that that conclusion is supported by the Supreme Court's decision in *Kelly*. Their opening brief on remand urges that all of their convictions be reversed.

The government on remand, insofar as the substantive counts of conviction are concerned, agrees with defendants that those counts cannot stand. It states that,

> [i]n light of the Supreme Court's holding in *Kelly*, it is now the position of the Department of Justice that in a case involving confidential government information, that information typically must have economic value in the hands of the relevant government entity to constitute "property" for purposes of 18 U.S.C. §§ 1343 and 1348. . . . A related, though not necessarily identical, analysis applies when determining what confidential information is a "thing of value" under 18 U.S.C. § 641. The Department has determined that the confidential information at issue in this case does not constitute "property" or a "thing of

12

value" under the relevant statutes after *Kelly*. To be sure, this Court recognized that "CMS *does* have an economic interest in its confidential predecisional information" because the agency "invests time and resources into generating and maintaining the confidentiality of" that information, and leaks affect the "efficient use of its limited time and resources." *Blaszczak[ I ]*, 947 F.3d at 33. But in the Department's view, shaped by *Kelly*, the CMS employee time at issue in this case did not constitute "an object of the fraud," and thus the associated "labor costs could not sustain the conviction[s]" here. *Kelly*, 140 S. Ct. at 1573.

(Government brief on remand at 7-8 (emphasis in brief).) "Accordingly," the government states, "this Office is constrained to confess error at the direction of the Solicitor General's Office" (*id*. at 8; *see also id*. at 2 ("This brief was prepared in consultation with the Office of the Solicitor General to reflect the Department of Justice's post-*Kelly* position on the scope of 'property' under 18 U.S.C. §§ 1343 and 1348, and a 'thing of value' under 18 U.S.C. § 641, which this Office is constrained to follow.")). The government urges that we either "reverse . . . the convictions" for conversion of United States property (Counts Three, Thirteen, and Eighteen), wire fraud (Counts Nine and Fifteen), Title 18 securities fraud (Counts Ten and Sixteen), and conspiracy to commit wire fraud and Title 18 securities fraud (Count Two) (Government brief on remand at 8-9), or that we remand the matter to the district court in order to permit the government to have those eight counts dismissed pursuant to Federal Rule of Criminal Procedure 48(a) (Government response to brief of Court-appointed amicus curiae at 8).

13

The government argues, however, that the conspiracy convictions on Counts One and Seventeen should be affirmed. Count One, on which Blaszczak, Huber, and Olan were convicted, alleged that defendants' objectives were not only to convert government property in violation of § 641, but also to commit Title 15 securities fraud and to defraud the United States in violation of 18 U.S.C. § 371. And Count Seventeen, alleged only against Blaszczak, alleged that his objectives were both conversion of government property and defrauding the United States. The government acknowledges that "[i]n light of [its] confession of error, . . . the Government is constrained to concede that the § 641 objects are legally invalid," but it argues that "the § 371 defraud-clause objects were not affected by *Kelly* and remain legally valid." (Government brief on remand at 10.) The government also concedes that the jury's "general verdict[s]" on Counts One and Seventeen, and "the presence of both legally invalid and legally valid objects gives rise to error" (*id*. (citing *Yates v. United States*, 354 U.S. 298 (1957))). However, it argues that the error is harmless in light of the "overwhelming evidence" that Blaszczak conspired with Huber and Olan (the Deerfield partners) to defraud the United States in connection with Deerfield's stock trading (Count One), and that Blaszczak conspired with another client to defraud the United States in connection with that client's stock trading (Count Seventeen).

14

In reply, defendants concur in the government's proposal to have the substantive counts and Count Two dismissed. Blaszczak, Huber, and Olan, in reply to the government's contention that their conviction(s) on Counts One and Seventeen should be affirmed, dispute the government's contention that any lack of clarity as to the basis of the jury verdicts on these counts was harmless. They argue that it is instead likely that the jury based its conspiracy verdicts on the § 641 allegations, given that the government ended its rebuttal summation by urging "the jury to 'take the jury form and mark guilty on Count One, *because that is a conspiracy to steal government information.*'" (Defendants' reply brief on remand at 13 (quoting trial transcript (emphasis in brief)).) They argue that the convictions on Counts One and Seventeen, if not reversed, must at least be vacated.

## II. DISCUSSION

For the reasons that follow, given the Supreme Court's decision in *Kelly* and the prosecutorial discretion to which the Executive Branch of the government is entitled, we grant the government's request to remand these cases to the district court for dismissal of the seven substantive counts of conviction and the conspiracy conviction in Count Two. In light of the lack of clarity as to whether the jury's

15

verdicts of guilt on Counts One and Seventeen were based on findings of conspiracy to violate § 641 or instead on conspiracy to defraud the government in violation of § 371 (or in Count One on conspiracy to commit Title 15 securities fraud), we vacate the judgments on Counts One and Seventeen and remand for such further proceedings on these counts as may be appropriate.

A. *The Government's Confession of Error in Light of* Kelly

"[O]ne of the core powers of the Executive Branch of the Federal Government [is] the power to prosecute." *United States v. Armstrong*, 517 U.S. 456, 467 (1996). "'[S]ubject to constitutional constraints,'" *id*. at 464 (quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979)), such as prohibitions against invidious discrimination, *see generally Armstrong*, 517 U.S. at 464-65, or vindictive prosecution, *see generally United States v. Goodwin*, 457 U.S. 368, 373-74 (1982), the United States "Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws," *Armstrong*, 517 U.S. at 464 (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985) (other internal quotation marks omitted)).

> In the ordinary case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether *or not* to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."

16

*Armstrong*, 517 U.S. at 464 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) (emphasis ours)).

> This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

*Wayte*, 470 U.S. at 607; *see also United States v. Knox*, 32 F.3d 733, 739 n.3 (3d Cir. 1994) ("[A] prosecutor always has broad discretion to decide the circumstances that warrant prosecution of a person for what the prosecutor fairly believes is unlawful conduct. When the prosecutor decides to prosecute, . . . it is the exclusive function of the judiciary to determine whether the conduct charged is unlawful *unless the prosecutor then withdraws the prosecution*." (emphasis added)).

The Federal Rules of Criminal Procedure provide, as pertinent here, that "[t]he government may, with leave of court, dismiss an indictment . . . ." Fed. R. Crim. P. 48(a).

> The principal object of the "leave of court" requirement is apparently to protect a defendant against prosecutorial harassment, *e.g.*, charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection. . . . But the Rule has also been held to permit the court to deny a Government dismissal motion to which the defendant has consented if the motion is prompted by *considerations clearly contrary to the public interest*.

17

*Rinaldi v. United States*, 434 U.S. 22, 29-30 n.15 (1977) (emphasis added); *see generally United States v. Cowan*, 524 F.2d 504, 509-11 (5th Cir. 1975) ("*Cowan*") (the "leave of court" requirement was added by the Supreme Court to the originally proposed version of Rule 48(a), which had required the government merely to give a statement of its reasons for dismissing a prosecution), *cert. denied sub nom. Woodruff v. United States*, 425 U.S. 971 (1976).

The government may elect to eschew or discontinue prosecutions for any of a number of reasons. Rarely will the judiciary overrule the Executive Branch's exercise of these prosecutorial decisions. For example, in *Petite v. United States*, 361 U.S. 529 (1960), the government, while not opposing the defendant's certiorari petition challenging his prosecution and conviction on the ground of double jeopardy, informed the Supreme Court that the Department of Justice ("Department" or "Justice Department"), "wholly apart from the question of the legal validity of the claim of double jeopardy," was considering whether the second prosecution of the defendant was consistent with Department policy for the control of government litigation. *Id.* at 530. Thereafter, the Solicitor General having announced a general policy against multiple prosecutions arising out of a single transaction or against a federal prosecution that would be duplicative of a state prosecution, *see id*. at 530-31, the government moved for, and the Supreme Court granted, a "remand[] to the Court of

Appeals to vacate its judgment [of affirmance] and to direct the District Court to vacate its judgment [of conviction] and to dismiss the indictment," *id*. at 531.

Even when a defendant has been tried, convicted, and sentenced in a prosecution that, under the *Petite* policy, would not have been brought if the Justice Department's internal procedures had been properly or timely followed, the courts have granted the government's eventual motion to vacate the conviction and have the indictment dismissed. *See, e.g., Rinaldi*, 434 U.S. at 23, 29-30; *United States v. Houltin*, 553 F.2d 991, 991-92 (5th Cir. 1977).

In *Gaona-Romero v. Gonzales*, 497 F.3d 694 (5th Cir. 2007), a government motion seeking termination of a proceeding reflected a change in a different Justice Department policy. The government moved to vacate a court of appeals decision upholding the removal of an alien who had been convicted of a controlled substances offense, but whose conviction had been vacated. The government reviewed its policy with regard to such cases, and decided to follow a revised Board of Immigration Appeals ("BIA") interpretation of "conviction," *see* 8 U.S.C. § 1101(a)(48)(A), to exclude convictions that were vacated on the basis of procedural or substantive error. The court of appeals granted the motion and "remand[ed] to the BIA so that the government may follow through on its pledge to withdraw the charge of removability." *Id*. at 695.

19

In cases in which the government itself has come to the view that a given defendant may not have been guilty of the crime of which he was convicted, the government has similarly moved to discontinue or dismiss the prosecution. For example, in *United States v. Weber*, 721 F.2d 266 (9th Cir. 1983), after Weber and his codefendants had been convicted and sentenced, the Assistant United States Attorney who had prosecuted the case interviewed Weber, received new information, and reexamined the evidence. As a result he "develop[ed] a serious and substantial doubt as to Weber's guilt," *id*. at 268, and the government moved under Rule 48(a) to dismiss the indictment against Weber. The district court, while stating that it had "no doubt" as to the prosecutor's "good faith doubt regarding Weber's guilt," *id*., denied the motion, apparently believing such a motion could not be granted after the defendant had been convicted, *see id*. at 269.

The court of appeals reversed, holding that "[s]eeking dismissal because of the existence of such a reasonable doubt" as to the defendant's guilt is "not clearly contrary to the manifest public interest." *Id*. (internal quotation marks omitted); *see also United States v. DiMattina*, 571 F. App'x 50, 50 (2d Cir. 2014) ("Defendant Frank DiMattina argues that his conviction for extortion is invalid because he did not 'obtain' any property for purposes of the Hobbs Act. The Government, in its brief on appeal, agrees and concedes that the judgment must be vacated in all respects. The

20

Government now seeks remand to the District Court 'so that [it] can move to dismiss the indictment with prejudice under Rule 48(a) of the Federal Rules of Criminal Procedure.' Appellee Br. 11. We agree that is the appropriate course of action.").

In *United States v. Smith*, 55 F.3d 157 (4th Cir. 1995) ("*Smith*"), Smith, who had originally pleaded not guilty and was being tried with four codefendants, decided mid-trial to plead guilty and agreed to testify against his codefendants. He testified truthfully, but the codefendants were acquitted. The government then moved under Rule 48(a) to dismiss the indictment against Smith, stating two reasons.

> First, [it] pointed to the acquittal of Smith's four codefendants and expressed the opinion that if Smith had not pleaded guilty, he, too, certainly would have been acquitted. Second, the United States Attorney pointed out that after pleading guilty Smith cooperated with the government and testified truthfully. The United States Attorney emphasized that dismissal promoted credibility in future attempts to enlist defendants to plead guilty, cooperate with the government, and truthfully testify in return for lenient treatment. He summed up his reasons as follows: "Obviously, it is not only in the public interest to do what is fair and right, but it is also in the public's interest to encourage persons with knowledge to cooperate with the United States."

*Id*. at 160. The district court, however, while finding no bad faith on the part of the United States Attorney, denied the motion, based on the court's "own assessment" that it "would be clearly contrary to [the] manifest public interest" to dismiss the indictment against Smith given that "Smith's guilty plea and corroborating testimony constituted substantial evidence of his guilt." *Id*.

21

The court of appeals reversed. While noting that the district court's own decision was reviewable for abuse of discretion, it pointed out that the exercise of judicial discretion in this regard must respect the prosecutorial discretion conferred on the Executive Branch:

> The court's discretion must be exercised in conformity with Rule 48(a) and the construction that the Supreme Court has placed on the rule. Because the discretion granted by Rule 48(a) involves the constitutional issue of the Separation of Powers Doctrine, a reviewing court must carefully scrutinize the district court's action. In *Newman v. United States*, 382 F.2d 479, 480 (D.C.Cir. 1967), Chief Justice Burger, then a circuit judge, wrote: "Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought."

*Smith*, 55 F.3d at 158.

> "Rule [48(a)] was not promulgated to shift absolute power from the Executive to the Judicial Branch. Rather, it was intended as a power to check power. The Executive remains the absolute judge of whether a prosecution should be initiated and the first and presumptively the best judge of whether a pending prosecution should be terminated. The exercise of its discretion with respect to the termination of pending prosecutions should not be judicially disturbed unless clearly contrary to manifest public interest. In this way, the essential function of each branch is synchronized to achieve a balance that serves both practical and constitutional values."

*Smith*, 55 F.3d at 158-59 (quoting *Cowan*, 524 F.2d at 513).

> *The disposition of a government's motion to dismiss an indictment should be decided by determining whether the prosecutor acted in good faith at the time he moved for dismissal. A motion that is not motivated by bad faith is not clearly contrary to manifest public interest, and it must be granted. . . .* [T]he trial court has little discretion in considering a government motion to dismiss made pursuant to Federal Rule of Criminal Procedure 48(a). *It must grant the motion absent a finding of bad faith or disservice to the public interest. . . . The disservice to the public interest must be found, if at all, in the motive of the prosecutor.* Examples of disservice to the public interest include the prosecutor's acceptance of a bribe, personal dislike of the victim, and dissatisfaction with the jury impaneled.

*Smith*, 55 F.3d at 159 (internal quotation marks omitted (emphases ours)); *see, e.g., Rinaldi*, 434 US. at 30 (regardless of the government's reasons for initiating or maintaining a prosecution, the "salient issue" as to its later decision to terminate it is whether the request to dismiss the indictment is "tainted with impropriety").

The *Smith* court of appeals reversed the denial of the government's Rule 48(a) motion, concluding that the district court's "own assessment of the public interest" and "[w]eighing [of] these interests d[id] not give adequate recognition to the Executive in the context of the Separation of Powers Doctrine as it exercises its duty in good faith to take care that the laws are faithfully executed." 55 F.3d at 160.

In *United States v. Fokker Services, B.V.*, 818 F.3d 733 (D.C. Cir. 2016) ("*Fokker*"), the government had entered into a deferred prosecution agreement ("DPA") with a defendant and had agreed not to prosecute certain persons. The district court regarded the DPA as an inappropriately "anemic[]" response to "egregious conduct"

23

over "a sustained period of time and for the benefit of one of our country's worst enemies," and it refused to exclude DPA cooperation time from the speedy trial clock as authorized by the Speedy Trial Act ("Act"). The court of appeals granted the government's petition for mandamus:

> [T]he Act confers no authority in a court to withhold exclusion of time pursuant to a DPA based on concerns that the government should bring different charges or should charge different defendants. Congress, in providing for courts to approve the exclusion of time pursuant to a DPA, acted against the backdrop of long-settled understandings about the independence of the Executive with regard to charging decisions. Nothing in the statute's terms or structure suggests any intention to subvert those constitutionally rooted principles so as to enable the Judiciary to *second-guess the Executive's exercise of discretion over the initiation and dismissal of criminal charges*.

*Id*. at 738 (emphasis added).

Finally, close to home, this Court honored the government's decision in light of *Kelly* to end its pursuit of a § 641 prosecution in *United States v. Aytes*, No. 19-3981, Dkt. No. 70 (2d Cir. Apr. 13, 2021) ("*Aytes*"). Aytes, after a jury trial in 2018, was found guilty of theft of government property in violation of § 641 for her unauthorized taking from the Federal Deposit Insurance Corporation ("FDIC") of paper and electronic copies of documents that detailed plans, in the event of a severe financial crisis, for the rapid and orderly liquidation of four banks regulated by the FDIC. Aytes successfully moved pursuant to Federal Rule of Criminal Procedure 29

24

for a judgment of acquittal, *see United States v. Aytes*, No. 18 CR 132, 2019 WL 5579485 (E.D.N.Y. Oct. 29, 2019); the government, with the approval of the Solicitor General, appealed. While Aytes's appeal was pending, the Supreme Court decided *Kelly* and granted certiorari in the present cases for reconsideration in light of *Kelly*; and the government in the present cases, upon instructions from the Solicitor General, confessed error and requested reversal of the convictions of--or dismissal of the indictment counts against--the present defendants on the § 641-related and other property-related counts.

The United States Attorney's Office that prosecuted Aytes, upon conferring with the Solicitor General, was instructed that the § 641 charges against her were not meaningfully distinguishable from the property-related charges in the present cases and that the government should move to dismiss its appeal from Aytes's judgment of acquittal. *See Aytes*, No. 19-3981, Dkt. No. 65 (government motion, Apr. 12, 2021). Accordingly, the government so moved; and this Court summarily granted the government's motion and its appeal was dismissed, thereby ending pursuit against Aytes of charges for theft of government regulatory information under § 641, *see Aytes*, No. 19-3981, Dkt. No. 70 (order of dismissal, Apr. 13, 2021).

With these considerations in mind, we conclude that the government's decision to seek the dismissal of the seven substantive counts convicting defendants under §§ 1343, 1348, and 641, along with the conspiracy charges in Count 2, is appropriate and owed deference. Nonetheless, we are also mindful that the government's confession of error "does not automatically govern an appellate court's disposition of an appeal." *United States v. Vasquez*, 85 F.3d 59, 60 (2d Cir. 1996) (collecting cases); *see also Young v. United States*, 315 U.S. 257 (1942).

In *Young*--a 1942 case arising prior to the adoption of Rule 48(a) with respect to the government's desire to dismiss a prosecution--a physician convicted of failing to maintain records required by the Harrison Narcotics Act, 26 U.S.C. §§ 2551(a) and (b), contended that his conduct fell beyond the record-keeping requirement. The government confessed error, and requested reversal and remand to the district court with direction to dismiss that count of the indictment. The Supreme Court declined to reverse without considering the merits:

> The public trust reposed in the law enforcement officers of the Government requires that they be quick to confess error when, in their opinion, a miscarriage of justice may result from their remaining silent. But such a confession does not relieve this Court of the performance of the judicial function. The considered judgment of the law enforcement officers that reversible error has been committed is entitled to great weight, but our judicial obligations compel us to examine independently the errors confessed. *See Parlton v. United States*, 64 App.D.C. 169, 75 F.2d 772. The public interest that a result be reached which promotes

26

> a well-ordered society is foremost in every criminal proceeding. That interest is entrusted to our consideration and protection as well as that of the enforcing officers. Furthermore, our judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of parties.

*Young*, 315 U.S. at 258-59.

To the extent that this Court is required to address the merits of the convictions on the counts as to which the government confesses error and/or requests a remand for dismissal, *see generally Young*, we conclude that in light of *Kelly*, §§ 1343, 1348, and 641 do not apply to the conduct that was at issue here.

B.      *The Confidential Information and the Timing of Agency Action Are Not CMS's "Property"*

As indicated in Part I.B. above, the *Kelly* Court noted that the relevant federal fraud statutes such as § 1343 are "limited in scope to the protection of property rights" and do not "criminaliz[e] all acts of dishonesty," and that the government therefore was required to prove, *inter alia*, that the object of the defendants' fraudulent scheme was money or property, *Kelly*, 140 S. Ct. at 1571-72 (internal quotation marks omitted). *Kelly* held that the defendants' conduct affecting the operation of the Port Authority did not fall within the scope of § 1343 or § 666(a)(1)(A) because "[t]he wire fraud statute thus prohibits only deceptive '"schemes to deprive [*the victim* of] money or property.'" 140 S. Ct. at 1571 (quoting *McNally v.*

27

*United States*, 483 U.S. 350, 356 (1987)) (brackets in *Kelly*; emphasis ours); *see, e.g.*, *Cleveland*, 531 U.S. at 15 ("the thing obtained must be property in the hands of the victim"); and the objective of the *Kelly* defendants' scheme was neither to deprive the Port Authority of its money or property nor to utilize for defendants' own purposes that agency's employees' paid time, but rather to reallocate the Bridge's access lanes. *Kelly* concluded that "a scheme to alter such a regulatory choice is not one to appropriate the *government's* property," *Kelly*, 140 S. Ct. at 1572 (emphasis added).

In the present case the same is true with respect to the counts charging various defendants with fraud in violation of §§ 1343 and 1348 or with conversion of government property in violation of § 641. In contrast, as to the counts of the indictment that charged violations of the Title 15 securities laws, the actual and intended victims of the alleged frauds would have been investors in the market for securities of the companies whose fortunes would be affected by the regulations promulgated by CMS. Indeed, as noted by the Court-appointed amicus curiae, "[a]t its core, this was a case about insider trading--an act already understood to be wrongful under [Title 15]." (Brief of Court-appointed amicus curiae at 19.) But the jury acquitted defendants on all of those Title 15 substantive counts; and in the remaining substantive counts at issue here, on which the jury convicted--the fraud

28

sections, §§ 1343 and 1348, and the section prohibiting "conver[sion]" of "money," or a "thing of value" from "the United States or any department or agency thereof," 18 U.S.C. § 641--the purported victim would have been the government agency CMS. Thus, defendants could not properly be convicted of violating §§ 1343, 1348, or 641 unless the objective of their schemes and conduct was money or property of CMS.

The Supreme Court in *Kelly* noted that it had previously established that a government agency's "exercise of regulatory power . . . fails to meet the [federal fraud] statutes' property requirement." 140 S. Ct. at 1568-69; *see id*. at 1572 (with regard to "a deceptive scheme to influence, to his own benefit, [a governmental entity's] issuance of gaming licenses," "this Court has already held that a scheme to alter such a regulatory choice is not one to appropriate the government's *property*" (citing *Cleveland*, 531 U.S. at 23) (emphasis added)). No greater property interest was involved in the CMS information at issue in the present case.

While confidential information may constitute property of a commercial entity such as the publisher victim in *Carpenter v. United States*, 484 U.S. 19 (1987)--for which confidential information was its "stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, and *to be distributed and sold to those who [would] pay money for it*," *id*. at 26 (internal quotation marks omitted; emphasis

29

ours)--the same is not true with respect to a regulatory agency such as CMS. CMS is not a commercial entity; it does not sell, or offer for sale, a service or a product.

CMS adopts regulations that affect, *inter alia*, business organizations or health industry entities, whether the affected persons or entities favor the regulations or not. And while CMS seeks to maintain confidentiality as to its planned regulations--and the regulations can plainly have either a favorable or an adverse effect on certain business entities' fortunes--a planned CMS regulation, even if disclosed to outsiders prematurely, remains within the exclusive control of CMS. And if it is prematurely disclosed to others, the disclosure has no direct impact on the government's fisc, although it might well impact CMS's subsequent regulatory choices. CMS can adhere to its planned regulation, or it can alter or abandon it; it can publish the regulation at the time it had planned, or it can postpone or advance the announcement or the regulation's effective date. As the Supreme Court recognized in *Cleveland* and emphasized in *Kelly*, the government's right to determine "who should get a benefit and who should not . . . do[es] 'not create a property interest.'" *Kelly*, 140 S. Ct. at 1572 (quoting *Cleveland*, 531 U.S. at 23)). The information reflecting such a decision and the timing of that disclosure are regulatory in character and do not constitute money or property of the victim; and they are not a "thing of value" to CMS that is susceptible to being "convert[ed]," 18 U.S.C. § 641.

30

We disagree with the dissent's contention that the present decision conflicts with this Court's precedent in *United States v. Girard*, 601 F.2d 69 (2d Cir. 1979). That case involved a drug dealer's attempt to purchase confidential records of the United States Drug Enforcement Administration ("DEA") as to what persons were DEA informants in certain DEA investigations. We ruled that such confidential information was a "thing of value" to the DEA within the meaning of § 641. *See* 601 F.2d at 71. And logically so: Such information has inherent value to the DEA in investigations and preparation for prosecutions; its theft would interfere with those operations, by allowing the targets of investigations to, for example, better conceal their criminal conduct, hide their contraband, or flee from arrest, as well as by imperiling the well-being of the undercover agents and confidential informants used in those operations. We cannot agree that such inherently valuable law enforcement information is comparable to the regulatory information at issue in the present case, which was the reimbursement rates that CMS would announce for certain health services and the planned dates of the announcements.

In sum, in *Kelly*, the scheme sought to alter the agency's exercise of its regulatory power. In the present case, the goal of the conduct at issue was a step removed from any attempt at alteration; defendants instead schemed to obtain and promptly utilize advance information as to how the regulatory power would be

31

exercised by CMS. As the conduct in *Kelly*--altering a regulation--does not constitute a deprivation of government property, *a fortiori* merely obtaining advance information as to what the agency's preferred regulation would be, and when it would be announced, cannot properly be considered the agency's money or property or a thing of value that could be "convert[ed]."

We respect the Executive's "decisions about *whether to initiate* charges, whom to prosecute, which charges to bring, *and whether to dismiss charges once brought*." *Fokker*, 818 F.3d at 737 (emphases added). The jury found defendants not guilty on any of the substantive counts alleging Title 15 securities fraud--the core of the case. The government's election, in light of *Kelly*, not to pursue the case further as one for conversion of, or fraud to obtain, government "property" is entitled to deference. And our independent review confirms that the dismissals requested by the government are required following *Kelly*. Accordingly, these cases will be remanded to the district court for dismissal of the substantive counts and the Count Two conspiracy charges.

C. *The Remaining Conspiracy Counts*

The only remaining counts of the indictment are Count One, on which Blaszczak, Huber, and Olan were convicted of conspiring, in violation of 18 U.S.C. § 371, to convert property belonging to the United States in violation of 18 U.S.C.

32

§ 641, to commit Title 15 securities fraud, and to defraud the United States in violation of § 371; and Count Seventeen, on which Blaszczak was convicted of conspiring, in violation of 18 U.S.C. § 371, to violate § 641 and to defraud the United States.

As to these counts, the jury was not given questions to answer that would reveal which one or more of the alleged conspiratorial goals it found proven. And since the government has confessed error as to charges that defendants' conduct was within the scope of § 641, and it no longer seeks to sustain these conspiracy convictions on the basis of § 641 property-conversion goals, the government acknowledges that the verdicts on these counts are "'flawed'" (Government brief on remand at 12 (quoting *Skilling v. United States*, 561 U.S. 358, 414 (2010))); *see id*. at 414 (quoting *Yates v. United States*, 354 U.S. 298 (1957) ("constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory")).

The government contends, however, that the convictions on Counts One and Seventeen can be affirmed on the ground that the error was harmless. We disagree. In harmless-error analysis, the government bears the burden of proof, *see, e.g.*, *United States v. Vonn*, 535 U.S. 55, 62 (2002); *United States v. Groysman*, 766 F.3d 147, 155 (2d Cir. 2014); and it must sustain that burden beyond a reasonable doubt,

*see generally Neder v. United States*, 527 U.S. 1, 15-19 (1999) (conviction may be affirmed if, after "a thorough examination of the record," the court "conclude[s] beyond a reasonable doubt that the jury verdict would have been the same absent the error," *id*. at 19); *see United States v. Coppola*, 671 F.3d 220, 237-38 (2d Cir. 2012) (a *Yates* error would be harmless where "the jury necessarily would have had to" convict defendant on the basis of the valid ground). Given the emphasis the government placed on theft in its rebuttal summation to the jury, and the fact that the only substantive crimes on which the jury returned verdicts of guilty were the alleged property crimes under § 641, § 1343, and § 1348, we cannot conclude that the government has carried its burden. Despite the fact that a plurality of the indictment's counts alleged substantive counts of Title 15 securities fraud--and "[a]t its core," that is what this case was about--the jury acquitted each defendant on every such count in which he was charged. We see no basis on which to infer that if there had been no charges of property crimes or conspiratorial goals to commit property crimes, the jury would necessarily have found that any of the defendants conspired to commit Title 15 securities fraud or to defraud the United States. We cannot conclude that the inclusion of § 641 conversion as a goal of the conspiracies alleged in Counts One and Seventeen was an error that was harmless.

34

On the other hand, we are not persuaded by defendants' argument that the convictions on these counts should simply be reversed. Counts One and Seventeen allege § 371 conspiracies to defraud the United States; Count One alleges an additional objective of committing Title 15 securities fraud. Section 371 encompasses not just conspiracies to commit property crimes, but conspiracy to commit "any offense against the United States" and any conspiracy to "defraud the United States, or any agency thereof in any manner or for any purpose." 18 U.S.C. § 371; *McNally v. United States*, 483 U.S. 350, 358 n.8 (1987) (the defraud clause of § 371 "reaches conspiracies other than those directed at property interests"). The record contained sufficient evidence for submission of these counts to the jury.

We conclude that the convictions on Counts One and Seventeen should be vacated, and the cases against Blaszczak, Huber, and Olan are remanded for such further proceedings as may be necessary on these counts, which may include a new trial.

## CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on this remand. For the reasons discussed above, these cases are

35

remanded to the district court to permit the government to dismiss Counts Two, Three, Nine, Ten, Thirteen, Fifteen, Sixteen, and Eighteen. The convictions of Blaszczak, Huber, and Olan on Count One and of Blaszczak on Count Seventeen are vacated, and the cases are remanded to the district court for such further proceedings on these two counts as may be appropriate.

JOHN M. WALKER, JR., *Circuit Judge*, joined by Judge Kearse, concurring:

I join Judge Kearse's opinion in full. I write separately to highlight an anomaly in a separate ruling in *Blaszczak I*[1] that, while not discussed by today's majority opinion because it is no longer outcome determinative, nevertheless deserves attention. In *Blaszczak I*, the panel held that a criminal conviction for tipper-tippee insider trading securities fraud prosecuted under 18 U.S.C. § 1348 does not require proof that the tipper received a "personal benefit."[2] This holding stands in contrast to the requirement of proof of a tipper's personal benefit when the government seeks criminal or civil penalties for insider trading under Section 10(b) of the Securities Exchange Act of 1934[3] and SEC Rule 10b-5 promulgated thereunder[4].

If that strikes one as odd, it should. Reasonable minds can certainly differ on how the law can best prevent insider trading without unduly impairing the normal functioning of security analysts as informational intermediaries between companies and the market. But traditional notions of fair play are offended by the present

---

[1] *United States v. Blaszczak*, 947 F.3d 19 (2d Cir. 2019), *judgment vacated sub nom. Olan v. United States*, 141 S. Ct. 1040 (2021), *and judgment vacated*, 141 S. Ct. 1040 (2021) ("*Blaszczak I*").

[2] *Id.* at 45.

[3] 15 U.S.C. § 78j(b).

[4] 17 C.F.R. § 240.10b-5.

incongruence in this circuit between civil and criminal deterrence. It should not require fewer elements to prove a criminal conviction than to impose civil penalties for the same conduct. This asymmetry deserves the further attention of our court, the Supreme Court, and Congress.

*      *      *

The government can punish insider trading in two ways: through civil penalties under Rule 10b-5 or criminal prosecution under either Rule 10b-5 or 18 U.S.C. § 1348. These laws broadly prohibit schemes or artifices to defraud in connection with the securities market. Neither provision expressly mentions insider trading, but both can be used to police it, although under different standards and elements.

Start with the text of § 10(b). The section prohibits any person from "us[ing] or employ[ing], in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe."[5] Acting upon its authority to implement § 10(b), the SEC promulgated Rule 10b-5, which makes it unlawful, *inter alia*, "to employ any device, scheme, or artifice to defraud" and "to engage in any act, practice, or course of

---

[5] 15 U.S.C. § 78j(b).

business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."[6] The texts of the statute and the regulation do not explicitly proscribe insider trading. Courts, however, have located the proscription within § 10(b)'s broad prohibition against using "any . . . deceptive device" as well as the "inherent unfairness" that arises when a person "secret[ly] profits" from informational asymmetries "intended to be available only for a corporate purpose."[7] But "not every instance of financial unfairness constitutes fraudulent activity under § 10(b)" and Rule 10b-5.[8] The elaboration of these anti-fraud provisions to cover insider trading has evolved through a process of judicial accretions and enforcement decisions that reflect "judgments as to why insider trading is or is not fraudulent, deceptive or manipulative."[9]

Courts have tethered § 10(b) and Rule 10b-5 liability to a breach of a fiduciary duty in connection with the purchase or sale of a security.[10] Under the "classical" theory, liability for insider trading is predicated on an insider's breach of the duty of trust and confidence

---

[6] 17 C.F.R. §§ 240.10b-5(a), (c).

[7] *Dirks v. SEC*, 463 U.S. 646, 654 (1983) (quoting *In re Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 43 S.E.C. 933, 936 (1968)).

[8] *Chiarella v. United States*, 445 U.S. 222, 232 (1980).

[9] *United States v. Chestman*, 947 F.2d 551, 573 (2d Cir. 1991) (en banc) (Winter, J., concurring in part and dissenting in part); *cf. Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737 (1975) (in the context of private actions under Rule 10b-5, courts "deal with a judicial oak which has grown from little more than a legislative acorn").

[10] *Chestman*, 947 F.2d at 570; *see also Chiarella*, 445 U.S. at 231-32.

that he owes, as an insider, to purchasers and sellers of his company's stock. An insider violates § 10(b) and Rule 10b-5 when he trades based on material, non-public information.[11] The insider can also be liable as a "tipper" when he divulges—or tips—that inside information to outsiders.

For an outsider, mere possession of an issuer's nonpublic market information does not create a duty.[12] But an outsider who acquires a company's inside information (a "tippee") may still be prohibited from trading on that information if he received it from a tipper who has breached her fiduciary duties and the tippee knows of the tipper's breach. It is the tipper's predicate breach that allows a tippee who trades with knowledge of the tipper's breach to be held derivatively liable. The touchstone for whether the tipper has breached those duties is whether the tipper received a "personal benefit" in exchange for providing the inside information.[13]

Again, nothing in the text of § 10(b) or Rule 10b-5 requires that the tipper receive a "personal benefit." But the Supreme Court, since

---

[11] *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997). *O'Hagan* recognized a second theory of insider trading liability—the "misappropriation theory"—premised on a breach of a duty a corporate "outsider" owes to the source of the information. Liability may attach when a person who owes no duty to company shareholders but to whom inside information has been entrusted "misappropriates [that] information for securities trading purposes." *Id.* at 652-53.

[12] *Dirks*, 463 U.S. at 654 (quoting *Chiarella*, 445 U.S. at 235).

[13] *United States v. Newman*, 773 F.3d 438, 447-48 (2d Cir. 2014), *abrogated on other grounds by Salman v. United States*, 137 S. Ct. 420 (2016).

4

*Dirks v. SEC*,[14] has imposed such a requirement. In a civil enforcement action against a tipper for a violation of § 10(b) and Rule 10b-5,[15] the government must prove that a tipper "(1) tip[ped] (2) material non-public information (3) in breach of a fiduciary duty of confidentiality owed to shareholders . . . or to the source of the information . . . (4) for personal benefit to the tipper."[16]

Likewise, a tippee may be civilly liable when: 1) he knew or had reason to know that the tipper disclosed that information in breach of a duty and received a personal benefit in the process and 2) the tippee used that information by trading or tipping for his own benefit in disregard of that knowledge.[17] The precise nature of the "personal benefit" in a particular case "will not always be easy for courts" to determine.[18] But at least in theory, the *Dirks* test provides a "simple and clear 'guiding principle' for determining tippee liability."[19]

---

[14] 463 U.S. at 662; *see also Salman v. United States*, 137 S. Ct. 420 (2016).

[15] 17 U.S.C. § 78u-1 (authorizing the SEC to seek civil penalties).

[16] *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012).

[17] *Id.* at 289; *see also Dirks*, 463 U.S. at 660 (noting that tippee liability in the civil context may be predicated when the tippee knows or "should know" of the tipper's breach). *Cf. Salman*, 137 S. Ct. at 423 (requiring knowledge of the tipper's breach and the personal benefit for criminal prosecutions); *United States v. Martoma*, 894 F.3d 64, 76 (2d Cir. 2017) ("*Martoma II*") (requiring that a tippee in a criminal prosecution be aware "not only that the tipper breached a fiduciary duty in disclosing inside information, but also that the tipper received a personal benefit").

[18] *Salman*, 137 S. Ct. at 429.

[19] *Id.* at 428 (quoting *Dirks*, 463 U.S. at 664). A personal benefit "may be indirect and intangible and need not be pecuniary at all." *Martoma II*, 894 F.3d at 75. Most recently, this court recognized that a personal benefit can exist based on, *inter alia*, "a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, or . . . an intention to benefit the particular recipient." *Id.* at 74.

5

Now we turn to the text of 18 U.S.C. § 1348, which provides a broad criminal prohibition against securities fraud and thus insider trading.[20] For the government to secure a criminal conviction for violations of 18 U.S.C. § 1348, it must prove that a defendant knowingly engaged in a "scheme or artifice to defraud any person in connection with" a registered security or commodity of a publicly traded company.[21] Like § 10(b) and Rule 10b-5, nothing in the text of 18 U.S.C. § 1348 requires proof of a personal benefit.[22]

The judicial accretion to § 10(b) and Rule 10b-5 requiring a personal benefit to the tipper and knowledge of such by the tippee is absent from our interpretation of § 1348. In *Blaszczak I* the panel declined to "graft the *Dirks* personal-benefit test onto the elements of Title 18 securities fraud" in a tipper-tippee insider trading prosecution.[23] Because 18 U.S.C. § 1348 requires no proof of a

---

[20] 18 U.S.C. § 1348. Congress enacted § 1348 with full knowledge of the jurisprudence regarding insider trading violations under Title 15. And, in 2009, when Congress amended the statute, Congress broadened its scope to include schemes to defraud that involved commodities futures. Pub. L. 107-204, Title VIII, § 807(a), 116 Stat. 804 (2002) (amended 2009).

[21] 18 U.S.C. § 1348(1). Section 1348 also makes it a crime "to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any . . . security." 18 U.S.C. § 1348(2). This provision is not relevant to this concurrence.

[22] The texts of the provisions do differ. Unlike § 10(b)'s requirement that a scheme have a nexus with a "purchase or sale" of a security, § 1348(1) broadly captures schemes "in connection with" any security. But the definition of "security" is more circumscribed for purposes of 18 U.S.C. § 1348 than in the Securities Exchange Act. *Compare* 18 U.S.C. § 1348(1) *with* 15 U.S.C. § 78c(a)(10).

[23] *Blaszczak I*, 947 F.3d at 37.

6

personal benefit, the panel observed that the statute gives the government "a different—*and broader*—enforcement mechanism" than is available under § 10(b) and Rule 10b-5.[24]

Consider some of the potential consequences of a legal scheme that requires fewer elements to convict someone criminally than to penalize someone civilly for the same conduct. The risk of overdeterrence looms large: The government has expressly acknowledged that securities analysts, who routinely "ferret out and analyze information" from corporate insiders to price accurately a security, are critical to a functioning market.[25] But when the bounds of permissible conduct are not clearly delineated, parties are prevented "from ordering their actions in accord with legal requirements."[26] The personal benefit test creates at least some legal distinction between those who gave and obtained tips fraudulently and those who appropriately engaged in the honest disclosure and collection of corporate information. In this way, the element provides corporate insiders and analysts (and their attorneys) with notice of "when the line is crossed."[27] Without it, corporate insiders may be more reticent to share information with analysts in the ordinary

---

[24] *Id.* at 36 (emphasis added).
[25] *Dirks*, 463 U.S. at 658 n.17 (citing government's brief).
[26] *Id.*
[27] *Id.*

course of business and analysts who do receive company information may be less likely to act on it for fear of running afoul of § 1348.

Beyond the problem that lawful market analyst activity may be inhibited in the wake of the *Blaszczak I* decision, 18 U.S.C. § 1348(1)'s criminal prohibition stands to capture more instances of tipper-tippee insider trading than would be civilly sanctionable. In the *Blaszczak* trial it was no accident that the jury convicted the defendants of insider trading fraud by violating 18 U.S.C. § 1348 but acquitted them of the same conduct under § 10(b) and Rule 10b-5.[28] Under *Blaszczak I*, the government may prosecute someone as a tippee when he trades on company information that he knows to be material and non-public, without proving that the source of that information was engaged in self-dealing.[29]

To be sure, the higher standard of proof to secure a criminal conviction may mitigate this incongruence to a degree. But the threat of criminal exposure (or a referral from the SEC to a United States Attorney's office) is a weighty cudgel in plea bargaining and in extracting civil settlements. It also poses a challenge to the lawyer

---

[28] *See Blaszczak I*, 947 F.3d at 26. Of course, with our opinion today, we vacate those convictions under § 1348 for the separate reason that the government failed to prove that the information the defendants obtained was "property" within the meaning of the statute—an element distinct from the receipt of a "personal benefit."

[29] *Id.* at 36.

advising the security analyst who has no desire to run afoul of the law but wants to be able to do his job effectively.[30]

*          *          *

We are taught that judges must "take the statute as we find it"[31] and that we should "assume that Congress is aware of existing law when it passes legislation," including statutes and judicial "gloss"— such as *Dirks*'s personal benefit test.[32] Thus I understand the *Blaszczak I* panel's decision, in the absence of Supreme Court guidance, not to import a personal benefit element to securities fraud prosecutions under 18 U.S.C. § 1348. I write separately, however, to highlight a glaring anomaly that the panel's decision creates and that warrants further attention by Congress and the courts.

---

[30] The dissent purports to explain the discrepancy between 18 U.S.C. § 1348 and § 10(b) and Rule 10b-5 by reference to the enacting Congresses' purpose. *See* Dissenting Opp. at 31-34. It does not address, however, the troubling *effects* on the heretofore legitimate conduct of securities analysts in the market who could not be subject to criminal or even civil liability under § 10b and Rule 10b-5, but may be prosecuted criminally for the same conduct under 18 U.S.C. § 1348, which are the focus of this concurrence.

[31] *Anderson v. Wilson*, 289 U.S. 20, 27 (1933) (Cardozo, J.).

[32] *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990).

RICHARD J. SULLIVAN, Circuit Judge, dissenting:

For the reasons set forth below and in this Court's 2019 opinion, I remain convinced that the defendants' convictions should be affirmed. *See United States v. Blaszczak (Blaszczak I)*, 947 F.3d 19 (2d. Cir. 2019). As the jury concluded beyond a reasonable doubt, the defendants participated in a multi-million-dollar scheme to misappropriate and trade on confidential information in the possession of the Centers for Medicare and Medicaid Services ("CMS") concerning the timing and content of contemplated changes to the agency's reimbursement rules. To my mind, nothing in the Supreme Court's subsequently issued opinion in *Kelly v. United States*, 140 S. Ct. 1565 (2020), alters the conclusion that "CMS information . . . constitute[d] 'property' in the hands of the government for purposes of the wire[-]fraud and Title 18 securities[-]fraud statutes," *Blaszczak I*, 947 F.3d at 26.

The majority opinion effectively permits sophisticated insiders to leverage their access to confidential government information and sell it to the highest bidders – in this case, hedge funds that used the confidential information to make millions shorting the stocks of public companies affected by CMS's regulations. In addition to running roughshod over CMS's obvious "property interest in . . . its [own] private records," *id.* at 33 (quoting *United States v. Girard*, 601 F.2d 69, 71

(2d Cir. 1979)), the majority opinion also threatens to upend decades of settled precedent concerning frauds premised on the theft of intangible property and suggests – in what amounts to dicta – a curious and troubling rule of deference that would require federal courts to acquiesce whenever the government announces a new, post-conviction statutory interpretation.

Equally troubling is the concurrence, which – also in dicta – offers a gratuitous advisory opinion on a subject that clearly exceeds the scope of the Supreme Court's remand order and, not surprisingly, was neither briefed nor argued by the parties on remand. In addition to its overreach, the concurrence is also wrong on the merits.

For all these reasons, I respectfully dissent.

## I.

The majority opinion concludes that confidential information held by a government agency is not property. *See* Maj. Op. at 27–32. That conclusion cannot be squared with the language of the federal fraud statutes at issue in this case. In particular, 18 U.S.C. § 1343, the wire-fraud statute, provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits

or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343. Similarly, section 1348, the Title 18 securities-fraud statute, provides in relevant part:

Whoever knowingly executes, or attempts to execute, a scheme or artifice – (1) to defraud any person in connection with any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer . . . ; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of . . . any security of an issuer . . . ; shall be fined under this title, or imprisoned not more than 25 years, or both.

*Id.* § 1348.[1]

Neither statute distinguishes between *tangible* and *intangible* property, or in any way suggests that information in the possession of a *government agency* as opposed to a *private entity* is beyond the scope of the statute. Each statute merely requires that the object of the fraud be "property" in the hands of the victim. *See*

---

[1] The superseding indictment charged the defendants with violating both subsections (1) and (2) of 18 U.S.C. § 1348, either of which may independently support a conviction. While only subsection (2) uses the term "property," the defendants do not argue that the object of a "scheme . . . to defraud" in subsection (1) can be anything other than "property." 18 U.S.C. § 1348. I have thus assumed, for purposes of this case, that the "property" requirement in subsection (2) also applies in subsection (1). *Id.*

3

*Cleveland v. United States*, 531 U.S. 12, 26 (2000); *see also Neder v. United States*, 527 U.S. 1, 20–21 (1999) (noting that Title 18 mail-, wire-, and bank-fraud statutes should be analyzed similarly). Here, the object of the defendants' fraud was CMS's confidential, proprietary information, and the Supreme Court's decision in *Kelly* does not compel the vacatur of the defendants' convictions.

**A.**

For nearly four decades, courts have recognized that confidential information constitutes property under the mail- and wire-fraud statutes. Nowhere is this better illustrated than in *Carpenter v. United States*, in which the Supreme Court held that the publication schedule and contents of forthcoming columns in *The Wall Street Journal* were the *Journal*'s "property" because "[t]he *Journal* had a property right in keeping confidential and making exclusive use" of the information before publication. 484 U.S. 19, 26 (1987). The Supreme Court noted that "[c]onfidential business information has long been recognized as property." *Id.* The Supreme Court also stressed that the *Journal* "ha[d] been deprived of its right to *exclusive* use of the information" and that "*exclusivity* is an important aspect of confidential business information and *most private property for that matter*." *Id.* at 26–27 (emphases added). The Supreme Court therefore

4

concluded that the *Journal* employee fraudulently misappropriated his employer's "property" in violation of the mail- and wire-fraud statutes when he knowingly disclosed the *Journal*'s confidential, pre-publication information to a stockbroker who traded on it. *Id.* at 28.

The Supreme Court reached a similar conclusion in *United States v. O'Hagan*, 521 U.S. 642 (1997). There, a corporate partner at a law firm was convicted on fifty-seven counts of mail fraud, securities fraud, and money laundering after he traded the securities of his client's acquisition target before the acquisition became public. *Id.* at 647. The Supreme Court upheld the convictions and recognized a "misappropriation theory" of fraud, under which a defendant's "undisclosed misappropriation of [confidential] information[] in violation of a fiduciary duty . . . constitutes fraud akin to embezzlement." *Id.* at 654. Applying the misappropriation theory, the Supreme Court reasoned that the defendant's convictions were valid, since the defendant breached the "duty of trust and confidence he owed to his law firm . . . and its client" when he "traded on the basis of *nonpublic information* regarding" the potential acquisition. *Id.* at 653 (emphasis added).

5

Decades later, it is difficult to see a meaningful distinction between *The Wall Street Journal*'s pre-publication information in *Carpenter*, the law firm's and its client's pre-acquisition information in *O'Hagan*, and CMS's pre-publication information concerning changes to its reimbursement rates here. In each case, the owner of the information "had a property right in keeping confidential and making exclusive use" of the information before publication. *Carpenter*, 484 U.S. at 26. And in each case, the defendants endeavored to misappropriate that information without the owner's knowledge and trade on it without the owner's consent.

**B.**

Like the dissent in *Blaszczak I*, the majority opinion relies heavily on *Cleveland v. United States* to suggest that confidential information in the possession of the government is somehow entitled to less protection than comparable confidential information in the hands of private entities. *See* Maj. Op. at 28. But *Cleveland* bears little resemblance to this case and creates no such immunity for the theft of governmental property. In *Cleveland*, the defendants were indicted for mail fraud under 18 U.S.C. § 1341 for fraudulently concealing information from the state of Louisiana in their applications to obtain poker-machine licenses. 531

6

U.S. at 17. The Supreme Court concluded that the defendants' convictions could not stand because an unissued license in the hands of the state is not property. *Id.* at 27. As the Court explained, prior to a license's issuance, the state's "core concern" is the "*regulatory*" decision, made in its capacity as sovereign, concerning whether to grant or deny the license. *Id.* at 20–21 (emphasis in original). According to the Court, a scheme to influence "a typical regulatory program" is not a scheme to deprive the government of its property. *Id.* at 21.

Clearly, the scheme in *Cleveland* to influence the government's licensing decisions had little in common with the *Blaszczak* defendants' scheme to misappropriate the government's confidential information. The goal of the defendants in this case was not to *influence* the government's licensing decision or *alter* the government's reimbursement policy – each of which obviously is a regulatory act. It was instead to *misappropriate* confidential information in CMS's possession so that the defendants could trade on it. Nowhere in *Cleveland* did the Supreme Court suggest that government entities are incapable of having property interests in such confidential information; the Court merely held that the government's *decision* whether to issue licenses – the object of the defendants'

7

fraudulent scheme there – was not itself *property*.  In the end, *Cleveland* has little to say about this case.

**C.**

The majority opinion nevertheless doubles down on its reading of *Cleveland* by insisting that the Supreme Court's decision in *Kelly v. United States* has radically truncated the government's property rights in its own confidential information.  Again, I am not persuaded.

In *Kelly*, the defendants were government employees who reallocated access to the George Washington Bridge in an effort to exert political pressure on a recalcitrant mayor.  140 S. Ct. at 1569–71.  For decades, three lanes feeding onto the bridge had been reserved for commuters coming from Fort Lee, New Jersey during the morning rush hour.  *See id* at 1568.  But as a form of political payback for the mayor's failure to endorse the incumbent governor in an upcoming election, employees in the New Jersey Governor's office created a horrific traffic jam by reducing the number of lanes dedicated to Fort Lee from three to one.  *See id.* at 1569.  The Supreme Court, relying principally on *Cleveland*, unanimously held that this was not a scheme that "aim[ed] to obtain money or property."  *Id.* at 1574.  As the Court observed, the defendants did not "walk away with the lanes" or

8

"convert[] them to a non-public use"; they merely closed two of the three traffic lanes, which "was a quintessential exercise of regulatory power." *Id.* at 1572. Finding that "a scheme to alter such a regulatory choice is not one to appropriate the government's property," *id.* (citing *Cleveland*, 531 U.S. at 23), the Supreme Court overturned the defendants' convictions under the federal fraud statutes, *id.* at 1574.

The differences between this case and *Kelly* are obvious. Here, CMS's confidential information more closely resembles the misappropriated property recognized in *Carpenter* than the allocation of traffic lanes at issue in *Kelly* or the licensing decision at issue in *Cleveland*. Like *The Wall Street Journal*, CMS had a "property right in keeping confidential and making exclusive use [of]" its nonpublic, pre-publication information. *Carpenter*, 484 U.S. at 26. In stark contrast to a state's right to allocate traffic lanes in *Kelly* or issue poker licenses in *Cleveland* – each a "paradigmatic exercise[] of the [state's] traditional police powers," *Cleveland*, 531 U.S. at 23 – the government's right to exclude the public from accessing its confidential information concerning the content and timing of its reimbursement rates for various medical procedures squarely implicates its role as a property holder, not as sovereign. *See Loretto v. Teleprompter Manhattan CATV*

9

*Corp.*, 458 U.S. 419, 435 (1982) ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."); *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2073 (2021) (describing the "central importance to property ownership of the right to exclude"). This view is consistent with decisions from this and other circuits. *See, e.g.*, *Girard*, 601 F.2d at 70–71 (concluding that "the [g]overnment has a property interest in certain of its private records," including the "confidential" information contained in those records); *United States v. Czubinski*, 106 F.3d 1069, 1074 (1st Cir. 1997) (holding that the IRS's confidential taxpayer information "may constitute intangible 'property'" under the wire-fraud statute (citing *Carpenter*, 484 U.S. at 26)).

Curiously, the majority opinion repeatedly quotes *Kelly*'s holding that "a scheme to alter . . . a regulatory choice is not one to appropriate the government's property." Maj. Op. at 10, 28, 29 (quoting *Kelly*, 140 S. Ct. at 1572). But that line from *Kelly* only highlights the difference between the two cases. Here, the defendants had no interest in "alter[ing]" CMS's "regulatory choice[s]." *Id.* Rather, their goal was to gain access to CMS's confidential, pre-publication reimbursement rates without being discovered so that they could trade on the information before it was disclosed to the public. In fact, the defendants' scheme

10

depended on keeping those choices – the timing and content of the reimbursement rates – *unaltered.* After all, only if the pre-publication information remained the same could they trade on the inside information for a profit before it became public.

The majority opinion insists that "altering" the government's regulation and "obtaining" the government's information amount to the same thing for purposes of sections 1343 and 1348. Maj. Op. at 31. But the verbs that the majority opinion uses – "altering" and "obtaining" – underscore the problem with conflating the government's two distinct roles. *Id.* "Altering" suggests the exertion of power upon another, *see Alter*, Oxford English Dictionary (3d ed. 2010) ("To make (a person or thing) otherwise or different in some respect."), whereas "obtaining" suggests the acquisition of a thing from another, *see Obtain*, Oxford English Dictionary (3d ed. 2010) ("To come into the possession of; to procure; to get, acquire, or secure."). While the former points to interfering with the state's regulatory role as sovereign, the latter points to interfering with the state's role as a property holder.

Fundamentally, the majority opinion's view obliterates the distinction – drawn by the Supreme Court in both *Cleveland* and *Kelly* – between

11

the government's exercise of regulatory authority and the government's possession of property in aid of its regulatory agenda. *See Cleveland*, 531 U.S. at 23–24 ("[T]he [s]tate's interest in licensing video poker operations . . . implicates the [state's] role as sovereign, not as property holder."); *Kelly*, 140 S. Ct. at 1572 ("The defendant's fraud implicated the [g]overnment's role as sovereign wielding traditional police powers – not its role as property holder." (alteration and internal quotation marks omitted)). To acknowledge that distinction is to acknowledge that the government can be a property holder.

Indeed, the *Kelly* Court's hypothetical examples of what *would have* amounted to fraudulently obtaining government property there – "walk[ing] away with the lanes" or "converting them to a non-public use," 140 S. Ct. at 1573 – aptly describes what the defendants actually did here. Worral "walk[ed] away with [CMS's confidential data]," and Blaszczak "convert[ed] them to . . . non-public use" in Huber and Olan's scheme to profit from shorting stock in companies that would be adversely impacted by CMS's yet-unannounced reimbursement decisions. *Id.*; *see Blaszczak I*, 947 F.3d at 26–27 (describing this scheme).

12

Finally, the majority follows the government's lead in invoking *Kelly* for the notion that confidential government information "typically must have economic value . . . to constitute 'property.'" Maj. Op. at 12. But the Supreme Court in *Kelly* simply held that a fraudulent scheme against the government must aim not just to "alter a regulatory decision," 140 S. Ct. at 1574, but "to obtain money or property," *id.* at 1573. The Supreme Court said nothing about the definition of property, let alone that it must have economic value. Because the object of the defendants' scheme in this case was to misappropriate CMS's confidential information, I see no reason to vacate the defendants' convictions on the basis of the Supreme Court's decision in *Kelly*.

### D.

Unable to rely on *Kelly*, the majority opinion resorts to other justifications for its holding that CMS's confidential information is not property – and not entitled to the same protections afforded to *The Wall Street Journal*'s pre-publication information in *Carpenter*. None is convincing.

13

**1.**

The majority opinion suggests that a government agency cannot have a property interest in confidential information because it "is not a commercial entity." Maj. Op. at 29–30. There are two problems with this reasoning.

As a threshold matter, such a conclusion is inconsistent with – and would effectively overrule – our precedent holding that "the [g]overnment has a property interest in certain of its private records," including the confidential information contained in those records. *Girard*, 601 F.2d at 71. Obviously, "one panel of this court may not overrule the decision of a prior panel," *Finkel v. Stratton Corp.*, 962 F.2d 169, 174–75 (2d Cir. 1992), unless "an intervening Supreme Court decision casts doubt on the prior ruling," *Doscher v. Sea Port Grp. Sec., LLC*, 832 F.3d 372, 378 (2d Cir. 2016) (citation omitted), *abrogated on other grounds by Badgerow v. Walters*, 142 S. Ct. 1310 (2022). Here, as explained above, *Kelly* casts no doubt on the well-established rule that government entities can and do have property rights.

The majority attempts to sidestep the clear holding of *Girard* by insisting that *Girard* is distinguishable from the case before us. It is not. In *Girard*, we affirmed the defendants' convictions under 18 U.S.C. §§ 641 and 371 for selling and conspiring to sell confidential information about informants working for the

14

Drug Enforcement Administration (the "DEA"). *See Girard*, 601 F.2d at 70. Although the majority opinion concedes that the DEA's informant records in *Girard* were "inherently valuable" to the DEA, it conclusorily asserts that CMS's reimbursement rates are not "comparable" to the DEA's informant records. Maj. Op. at 31. In fact, both this case and *Girard* concern whether the government has a property interest in the "intangible" contents of its "confidential," "unpublished writings." *Girard*, 601 F.2d at 71. Like the informant records in *Girard*, which the majority opinion deems to have "inherent value to the DEA in investigations and preparation for prosecutions," Maj. Op. at 31, the reimbursement rates here were integral to CMS's administration of "federal . . . healthcare financing programs," App'x at 464. And just as the "theft [of the informant records in *Girard*] would interfere with [the DEA's] operations," Maj. Op. at 31, the pre-publication leak of CMS's reimbursement rates here would "risk[] hampering the agency's decision-making process" by encouraging "unbalanced lobbying efforts," "making it more difficult to manage the [information] process flow," and "requir[ing] the agency to tighten up its internal information-sharing processes," *Blaszczak I*, 947 F.3d at 33 (internal quotation marks omitted) (citing App'x at 467). Fundamentally, nothing in *Girard* justifies the majority's conclusion that the

15

government can have a property interest in the DEA's confidential informant information but not in CMS's pre-publication reimbursement rates. The majority's disclaimer that it is not overruling *Girard* is therefore hard to reconcile with the clear similarity between the facts and logic of the two cases.

Nevertheless, even if this panel had the power to overrule *Girard*, the majority opinion offers no rationale for a rule that would protect the property rights of commercial entities but not those of governmental agencies possessing comparable information. Why, one might ask, would the fraud statutes prohibit schemes to gain access to a manufacturer's confidential information concerning the costs of production for assorted medical devices, but not extend that same protection to the government's confidential information regarding the reimbursement rates for those very devices? Certainly, no such distinction appears on the face of sections 1343 or 1348, and it defies common sense to think that Congress would give fraudsters carte blanche to misappropriate the "confidential information" of any and every "regulatory agency." Maj. Op. at 29.

**2.**

As in the *Blaszczak I* dissent, the majority opinion also implies that entities cannot have a property interest in confidential information unless the confidential

16

information constitutes their "stock in trade" – a phrase plucked from *Carpenter*. Maj. Op. at 29 (quoting *Carpenter*, 484 U.S. at 26). But while the *Carpenter* court did use that phrase to help illustrate the *Journal*'s interest in the property, it never made that a prerequisite for information to be considered property. Indeed, there are myriad cases in which the misappropriated property – whether press releases, earnings reports, or merger information – was deemed to be property for purposes of the mail-, wire-, and securities-fraud statutes even though the information in question was clearly *not* part of the victim's "stock in trade." *See, e.g.*, *United States v. Khalupsky*, 5 F.4th 279, 285 (2d Cir. 2021) (affirming wire- and securities-fraud convictions based on trades using "information from stolen, pre-publication press releases" of various publicly traded companies); *SEC v. Dorozhko*, 574 F.3d 42, 44 (2d Cir. 2009) (vacating the district court's denial of the SEC's motion for an asset-freeze injunction in an enforcement action based on the defendant's hacking activities to gain access to a healthcare company's "earnings reports"); *O'Hagan*, 521 U.S. at 672 (upholding mail- and securities-fraud convictions for "fraudulent trading on material, nonpublic information" regarding "the tender offer" for a major grain and foodstuffs producer). In none of these cases did the misappropriated information relate to the core business – or "stock in trade" – of

17

the defrauded entities. The majority opinion's "stock[-]in[-]trade" requirement would effectively undermine each of these cases without offering any principled basis for doing so.

**3.**

Additionally, the majority opinion suggests that property interest is limited to goods that can be "distributed and sold to those who would pay money for it." Maj. Op. at 29 (quoting *Carpenter*, 484 U.S. at 26) (alterations omitted). But the law does not suggest that a property interest exists only in things that can be monetized. *See Phillips v. Washington Legal Found.*, 524 U.S. 156, 170 (1998) ("While the interest income at issue here may have no economically realizable value to its owner, possession, control, and disposition are nonetheless valuable rights that inhere in the property."). Indeed, there are many items – tangible and intangible – that have no market value but are clearly recognized as property. For instance, there may not be any market value for the baby shoes, diaries, or old photos of our non-celebrity relatives, but there is no question that we own those things after they are passed down to us. *See, e.g.*, Restatement (Second) of Torts §§ 222A, 911 cmt. e (Am. L. Inst. 1979) (noting that for purposes of liability and damages for conversion, "[s]ome things may have no exchange value but may be

18

valuable to the owner"). In short, the ability to monetize property does not define property rights.

Relatedly, the majority opinion stresses the fact that the disclosure of a government agency's confidential information has no effect on the public fisc. Maj. Op. at 30. That of course is true but beside the point. Whether the victim is economically harmed by the misappropriation is immaterial to whether the misappropriated information is in fact property. There was no evidence in *Carpenter* to suggest that *The Wall Street Journal*'s bottom line was affected by the misappropriation of its columns, or that its ability to publish articles or retain subscribers was in any way compromised. Regardless of any economic harm that it may suffer as a result of the misappropriation, the owner still retains its property right in the confidential information and may exclude others from accessing and using it.

\* \* \*

In short, the majority opinion's efforts to distinguish between the pre-publication information in *Carpenter* and CMS's confidential information here are not persuasive. *Kelly* only reinforces that governments – like corporations, partnerships, and individuals – can possess property rights in confidential

19

information. It logically follows that schemes to misappropriate such information are clearly within the scope of the federal mail-, wire-, and securities-fraud statutes. I therefore see no basis for the majority's conclusion that CMS's confidential information did not constitute "property" for purposes of 18 U.S.C. §§ 1343 and 1348.[2]

## II.

The bulk of the majority opinion, however, focuses not on *Kelly*'s application to this case, but rather on the "deference" that we purportedly "owe[]" to "the Department of Justice's post-*Kelly* position on the scope of 'property' under 18 U.S.C. §§ 1343 and 1348." Maj. Op. at 13, 26 (quoting Gov't Suppl. Br. at 2). The portion of the majority opinion addressing that issue – which was neither briefed nor argued by the parties – is dicta. It is "a point of law [that] might have been decided either way without affecting" the majority's bottom-line "decision"; it

---

[2] The majority opinion also holds that CMS's confidential information concerning its reimbursement rates did not constitute a "thing of value" for purposes of 18 U.S.C. § 641. *See* Maj. Op. at 30. Our case law defines the phrase "thing of value" under section 641 by reference to case law interpreting the term "property." *See Girard*, 601 F.2d at 71. But, as discussed, *Girard* also defines both "thing of value" and "property" to include certain private government records, including the "confidential" information contained in those records. *Id.* The majority opinion has not articulated any reason to depart from *Girard*, and I would continue to follow this Court's precedent and hold that CMS's confidential information constitutes both a "thing of value" and "property" under the relevant statutes.

20

therefore "cannot be binding." *Jimenez v. Walker*, 458 F.3d 130, 142–43 (2d Cir. 2006) (quoting *Carroll v. Lessee of Carroll*, 57 U.S. (16 How.) 275, 286–87 (1853)) (other citation omitted). Indeed, the majority opinion appears to recognize as much. After nearly twenty pages spent straining to establish that "the prosecutorial discretion [of] the Executive Branch" is a reason "to remand the cases to the district court for dismissal," Maj. Op. at 6, the majority opinion ultimately acknowledges that we may in fact be "required to address the merits of the convictions," *id.* at 27 – and then decides the appeal on the basis that the defendants' convictions cannot be sustained in light of *Kelly*.

In any event, I disagree with the majority opinion's suggestion that "the Department of Justice's post-*Kelly* position on the scope of 'property' under [sections] 1343 and 1348" is "owed deference" of any form. Maj. Op. at 13, 26 (quoting Gov't Suppl. Br. at 2). From the outset, that suggestion is in tension with the Supreme Court's repeated admonitions that "criminal laws are for courts, not for the [g]overnment, to construe," *Abramski v. United States*, 573 U.S. 169, 191 (2014), and that accordingly, the "[g]overnment's reading of a criminal statute" is not "entitled to any deference," *United States v. Apel*, 571 U.S. 359, 369 (2014). Indeed, "court[s] ha[ve] an obligation to correct" the Department of Justice's

21

"error[s]" in interpreting criminal statutes, regardless of "[w]hether the [g]overnment interprets a criminal statute too broadly *or too narrowly*." *Abramski*, 573 U.S. at 191 (emphasis added).

The majority opinion attempts to maneuver around these precedents by characterizing "the government's decision" to "confess[] . . . error" and "seek the dismissal of the . . . counts convicting defendants" as an exercise of "the prosecutorial discretion to which the Executive Branch of the government is entitled." Maj. Op. at 15, 26. But as the Supreme Court has explained – and the majority opinion itself acknowledges – "such a confession [of error] does not relieve . . . [c]ourt[s] of the performance of the judicial function," *id.* at 21 (quoting *Young v. United States*, 315 U.S. 257, 258 (1942)), which of course "is emphatically . . . to say *what the law is*," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) (emphasis added). In other words, since "our judgments are precedents" that implicate "[t]he public interest . . . in *every* criminal proceeding," the "proper administration of the criminal law cannot be left merely to the stipulation of parties." *Young*, 315 U.S. at 259 (emphasis added). For that reason, "[i]t is the uniform practice of [the Supreme] Court to conduct its own examination of the record in all cases where the [f]ederal [g]overnment . . . confesses that a

22

conviction has been erroneously obtained." *Sibron v. New York*, 392 U.S. 40, 58 (1968); *see also Young*, 315 U.S. at 258–59 ("[O]ur judicial obligations compel us to examine independently the errors confessed.").

The Supreme Court's recent decision in *Terry v. United States* is instructive on this point. 141 S. Ct. 1858 (2021). There, a prisoner petitioned the district court for a resentencing pursuant to the First Step Act, arguing that he fell within the category of crack-cocaine offenders covered by that Act. *See id.* at 1862. The district court denied his motion, the Eleventh Circuit affirmed, and the Supreme Court granted certiorari. *See id.* On the day the government's brief was due, the Solicitor General informed the Supreme Court that, "after the change in administration," the government "would no longer defend the judgment" of the Eleventh Circuit. *Id.* But the Supreme Court did not blindly acquiesce in the Solicitor General's request to summarily reverse the Eleventh Circuit. Instead, the Court rescheduled argument and appointed an amicus curiae to argue in support of the judgment – which the Supreme Court ultimately affirmed in a unanimous opinion. *See id.* at 1864.

The Supreme Court appoints an amicus to argue a case about once a year, *see* Katherine Shaw, *Friends of the Court: Evaluating the Supreme Court's Amicus*

23

*Invitations*, 101 Cornell L. Rev. 1533, 1548 (2016), often in situations where the government does not oppose the position advanced by its adversary, *see, e.g.*, *Terry*, 141 S. Ct. at 1864; *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2195 (2020) (appointing an amicus when the government declined to oppose its petitioner's arguments). This practice would be nonsensical – not to mention unconstitutional – under the majority opinion's theory that separation-of-powers principles compel us to defer to the government whenever it confesses error.

While there can be no doubt that the government has broad discretion in deciding *which* cases to prosecute and *how* to prosecute those cases, once the government has involved the judiciary by obtaining an indictment or a conviction, its discretion is tempered by the courts' independent obligations. In other words, we cannot tell the government whom to prosecute. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute . . . generally rests entirely in his discretion."); *see also Wayte v. United States*, 470 U.S. 598, 607–08 (1985) (examining the "substantial concerns that make the courts properly hesitant to examine the decision *whether to prosecute*" (emphasis added)). The government likewise cannot tell us whether to vacate a

24

duly obtained conviction. *See Young*, 315 U.S. at 258–59 ("The public trust reposed in the law[-]enforcement officers of the [g]overnment requires that they be quick to confess error when, in their opinion, a miscarriage of justice may result from their remaining silent. But . . . our judicial obligations compel us to examine independently the errors confessed.").

The majority opinion's citations to cases in which courts have "honored the government's decision . . . to end its pursuit of a . . . prosecution," Maj. Op. at 24; *see generally id.* at 16–27, only underscore that the government's broad discretion to "terminate" an *ongoing* prosecution, *id.* at 18, 19 (citations omitted), stops short of binding appellate courts "to treat a confession of error by the United States as an appellate nolle prosequi," *Cachoian v. United States*, 452 F.2d 548, 550 (5th Cir. 1971). Upon closer inspection, those cases are readily distinguishable from the one before us. Here, we are asked to decide whether final judgments of conviction entered after a jury trial and sentencing should be vacated because the government now contends that they were based on an alleged legal error. Most of the cases cited in the majority opinion, however, were in materially different procedural

25

postures.[3]  And in the few cases in which courts agreed with the government's request to dismiss an indictment or vacate a judgment of conviction, those courts did so only *after* fulfilling their obligation to independently assess the underlying validity of the indictments or convictions at issue.  *See, e.g.*, *Rinaldi v. United States*, 434 U.S. 22, 23, 29–30 (1977) (dismissing indictment); *United States v. DiMattina*, 571 Fed. App'x 50 (2d Cir. 2014) (vacating conviction).[4]  Again, to quote the Supreme Court in *Young*, the government's confession of error "does not relieve [courts] of the performance of the judicial function" – rather, "our judicial obligations compel us to examine independently the errors confessed."  315 U.S. at 258–59; *see also Petite v. United States*, 361 U.S. 529, 533 (1960) (Brennan, *J.*, concurring) ("Even where the Government confesses error, [the Supreme] Court examines the case on the merits itself.").

---

[3] *See Gaona-Romero v. Gonzales*, 497 F.3d 695 (5th Cir. 2007) (vacating a prior panel's decision affirming a final order of removal by the Board of Immigration Appeals); *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 738 (D.C. Cir. 2016) (vacating the district court's denial of a joint motion to exclude time under the Speedy Trial Act); Order Dismissing Appeal, *United States v. Aytes*, No. 19-3981, Doc. No. 70 (2d Cir. Apr. 13, 2021) (granting the government's motion to dismiss its appeal of the district court's judgment of acquittal).

[4] *See also United States v. Weber*, 721 F.2d 266, 268–89 (9th Cir. 1983) (considering whether dismissal was "clearly contrary to manifest public interest"); *United States v. Smith*, 55 F.3d 157, 160 (4th Cir. 1995) (concluding that there was "[a] substantial, reasonable doubt about the guilt of [the] defendant").

The majority opinion gets it backwards by suggesting that "the [s]eparation of [p]owers," Maj. Op. at 23 (citation omitted), might compel us "to accept [the government's] view blindly," *Sibron*, 392 U.S. at 59. In actuality, the principles of the separation of powers cut in precisely the opposite direction. To "blindly" defer to the government's confession of error "would be . . . an abdication of our obligation to lower courts to decide cases upon proper . . . grounds in a manner which permits them to conform their future behavior to the demands of the [federal criminal law]." *Id.* Moreover, "it ill behooves this Court to defer to the Solicitor General's suggestion that a [district court] may have been in error after another representative of the Executive Branch and the Justice Department has persuaded the [district court] to reach the result which it did." *Mariscal v. United States*, 449 U.S. 405, 406–07 (1981) (Rehnquist, *J.*, dissenting).

In short, we may not mechanically defer to the government in determining whether a defendant's convictions should be vacated. "We sit in this case not to enforce the requests of the Department of Justice but to review the action of a lower court," *Casey v. United States*, 343 U.S. 808, 811 (1952) (Douglas, *J.*, dissenting), now "in light of *Kelly*['s]" guidance, *Blaszczak v. United States*, 141 S. Ct. 1040 (2021). The question we must ask – which only *we* may answer – is whether

27

*Kelly* compels the vacatur of the defendants' convictions. Because I see nothing in *Kelly* to alter our prior conclusion that "CMS information . . . constitute[d] 'property' in the hands of the government for purposes of the wire[-]fraud and Title 18 securities[-]fraud statutes," *Blaszczak I*, 947 F.3d at 26, I would affirm.

## III.

I turn finally to the concurrence, which similarly offers pages of dicta on a subject that is not even properly before us – *Blaszczak I*'s holding that 18 U.S.C. § 1348 does not require proof that the tipper of non-public information received a personal benefit for the tip.

The concurrence suggests that this issue was "not discussed by today's majority opinion because it is no longer outcome determinative" in light of the majority's conclusion that the confidential information at issue was neither "property" nor a "thing of value" in the first place. Concurrence at 1. That alone is a reason not to delve into the personal-benefits issue. "Courts are essentially passive instruments of government" that "should not[] sally forth each day looking for wrongs to right," *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (citations omitted), "decide abstract questions," *Socialist Lab. Party v. Gilligan*, 406 U.S. 583, 586 (1972), or "give opinions advising what the law would

be upon a hypothetical state of facts," *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (internal quotation marks and alteration omitted). Instead, the Constitution "limit[s]" our "role" to deciding "actual cases or controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (citation omitted). From that constitutional limitation springs "the cardinal principle of judicial restraint": "if it is not necessary to [say] more" to dispose of a case, then it generally "is necessary *not* to [say] more." *Miller v. Metro. Life Ins. Co.*, 979 F.3d 118, 124 (2d Cir. 2020) (quoting *PDK Lab'ys v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, *J.*, concurring)) (emphasis added). There are also sound pragmatic reasons to avoid "making pronouncements that have no consequence for the dispute": as one of our colleagues has persuasively argued, "courts are more likely to exercise flawed, ill-considered judgment, more likely to overlook salutary cautions and contraindications, [and] more likely to pronounce flawed rules, when uttering dicta than when deciding the[] cases" that are actually before them. Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1255, 1267–68 (2006). In sum, courts are simply not free to opine on hypothetical topics, regardless of whether those topics "warrant[] further attention by Congress and the courts." Concurrence at 11.

More importantly, the issue raised in the concurrence is, in fact, completely outside the scope of the Supreme Court's remand order, which vacated *Blaszczak I* and remanded the case back to us "for further consideration in light of *Kelly v. United States.*" *Blaszczak*, 141 S. Ct. at 1040. "Any reconsideration at this juncture of our earlier opinion must be limited to the scope of the Supreme Court's remand." *Escalera v. Coombe*, 852 F.2d 45, 47 (2d Cir. 1988). Thus, because the Supreme Court specifically "vacated our opinion and remanded for reconsideration in light of [*Kelly*]," we may "not reconsider issues that are not directly implicated by the Supreme Court's decision in [*Kelly*]." *Id.*; *accord Robinson v. Ariyoshi*, 854 F.2d 1189, 1189–90 (9th Cir. 1988); *Kotler v. Am. Tobacco Co.*, 981 F.2d 7, 12–13 (1st Cir. 1992); *United States v. Duarte-Juarez*, 441 F.3d 336, 340 (5th Cir. 2006).

I am therefore reluctant to engage with the substance of the concurrence's musings on section 1348 and the asserted anomalies created by the Second Circuit's now vacated opinion in *Blaszczak I.* I respond only to address several of the most troubling aspects of the concurrence, lest future litigants and courts mistakenly conclude that its pronouncements are uncontested.

The concurrence notes that the scope of liability under Rule 10b-5 and 18 U.S.C. § 1348 differ. Under *Dirks v. SEC*, tipper-tippee liability under Rule 10b-5 requires evidence of a personal benefit, whereas under *Blaszczak I*, which has been vacated, we held that there was no personal-benefit requirement for liability under section 1348. 463 U.S. 646 (1983). The concurrence finds this difference "anomal[ous]" and troubling because, perhaps, it may be easier for the government to criminally prosecute a defendant under section 1348 than it would be under Rule 10b-5. Concurrence at 1. But this difference is not surprising, and certainly not unique in American law. *See, e.g.*, William J. Stuntz, The Pathological Politics of Criminal Law, 100 Mich. L. Rev. 505, 600 n.62 (2001) ("[T]here are 325 separate prohibitions of fraud, misrepresentation, or both in the federal code.") Indeed, "[t]he Federal Criminal Code is replete with provisions that criminalize overlapping conduct," and so "[t]he mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." *Pasquantino v. United States*, 544 U.S. 349, 358 n.4. (2005). One might argue as a matter of policy or equity that the standards under section 1348 and Rule 10b-5 should be the same. But there is nothing in the statutes or case law that compels such a conclusion.

31

Moreover, the personal-benefit test under Rule 10b-5 is a judge-made rule premised on the statutory purpose of the Securities Exchange Act of 1934 (the "Exchange Act"). As *Dirks* explained, to protect the free flow of information into the securities markets, Congress enacted the Title 15 fraud provisions with the limited "purpose of . . . eliminat[ing] [the] use of inside information for *personal advantage*." 463 U.S. at 662 (emphasis added and internal quotation marks omitted). *Dirks* effectuated this purpose by holding that insiders could not be prosecuted for breaching their fiduciary duties by tipping confidential information unless they did so in exchange for a personal benefit. *Id.* at 662–64; *see also United States v. Chestman*, 947 F.2d 551, 581 (2d Cir. 1991) (en banc) (Winter, *J.,* concurring in part and dissenting in part) (observing that the "*Dirks* rule is derived from securities law, and . . . [is] influenced by the need to allow persons to profit from generating information about firms so that the pricing of securities is efficient"); *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 298 (S.D.N.Y. 2018) (Rakoff, *J.*) ("Although [the *Dirks* personal-benefit test] was novel law, the Court reasoned that this test was consistent with the 'purpose of the [Title 15] securities laws . . . to eliminate use of inside information for personal advantage.'" (quoting *Dirks*, 463 U.S. at 662)). Because the *Dirks* personal-benefit test effectuates the purpose of

the Exchange Act, codified in Title 15, there is no obvious reason to extend that rule to a different statutory provision under Title 18.

While the concurrence acknowledges that "nothing in the text of [section] 1348 requires proof of a personal benefit," it insists that there is something troubling about interpreting the statute to "give[] the government a different – and broader – enforcement mechanism than is available under [section] 10(b) and Rule 10b-5." Concurrence at 6–7 (internal quotations omitted). But section 1348 was passed in the wake of the 2008 financial crisis and designed to "provide[] [f]ederal investigators and prosecutors with significant new criminal and civil tools to assist in holding accountable those who have committed financial fraud." Presidential Statement on Signing the Fraud Enforcement Act of 2009, 1 Pub. Papers 689 (May 20, 2009). The history and purpose of section 1348 therefore make it far more plausible that Congress did not intend for it to be a mere carbon copy of the Title 15 securities-fraud statute. And since our task is merely to ascertain the meaning of section 1348 – not to second-guess Congress's wisdom or motives in enacting it – we need not speculate, as the concurrence does, about the "troubling *effects*" that may result from broadening the scope of criminal

33

liability beyond what is provided for under section 10b and Rule 10b-5. Concurrence at 10 n.30.[5]

## IV.

For all the reasons discussed above, I respectfully dissent. I firmly believe that the majority's holding – that CMS's confidential non-public information concerning the timing and content of the agency's reimbursement rates is not property – is wrong and not compelled by *United States v. Kelly*. I also believe that the remaining dicta in the majority and concurring opinions will lead to confusion among litigants, lawyers, and lower courts alike. I fear that the only winners in this appeal will be the defendants – sophisticated insiders who misappropriated confidential government information to enrich themselves and their associated

---

[5] In a similar vein, the majority opinion announces that "the actual and intended victims of the alleged [insider trading scheme] would have been investors in the market for securities of the companies whose fortunes would be affected by the regulations promulgated by . . . CMS." Maj. Op. at 23. That is not the case. Under either Title 15 or Title 18, investors in the market are *not* the victims of insider trading; the only victim of insider trading is the entity whose non-public information was misappropriated. *See, e.g.*, *Carpenter*, 484 U.S. at 24 ("[T]he victim of the fraud [was] the *Journal*, . . . not a buyer or seller of the stocks traded in or otherwise a market participant."); *Obus*, 693 F.3d at 291 (identifying the "victim" of the insider-trading scheme as the company whose business proposal had been misappropriated); Marc I. Steinberg & Ralph C. Ferrara, 25 Secs. Prac. Fed. & State Enforcement, App. 2F (2022) (When "the plaintiff alleged that it was defrauded . . . by having information secretly stolen," clearly, "the plaintiff corporation was a victim of the defendant's misappropriation."). The victim here is obviously CMS – precisely because its confidential, intangible property was misappropriated.

hedge funds – and those like them who will be emboldened by today's decision to believe that the broad proscriptions of the federal fraud statutes do not in fact mean what they say. It is clear, to me at least, that the defendants are not the victims of prosecutorial overreach or vague statutes; they are instead the beneficiaries of a windfall generated by a flawed legal analysis.